2004 WY 8

**Alvin HANNON, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

**No. 02–277.**

Supreme Court of Wyoming.

Feb. 11, 2004.

Representing Appellant: Ken Koski, State
Public Defender, PDP; Donna D. Domonkos,
Appellate Counsel; Diane E. Courselle, Di-
rector DAP; Anna M. Reeves, Intern DAP;

Kristin M. Siegel, Intern; and Jeff Stanbury, Intern DAP.

Representing Appellee: Patrick J. Crank, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; and Daniel M. Fetsco, Assistant Attorney General.

Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.

KITE, Justice.

[¶ 1] Alvin Ray Hannon was convicted of two counts each of second and third degree sexual assault and one count of attempted third degree sexual assault. On appeal, he claims the district court erred in limiting his cross-examination of the victim, denying his motion to suppress statements he made to law enforcement, and excluding expert testimony concerning his mental state. We hold that reversible error occurred when the trial court prohibited defense counsel from cross-examining the victim about the fact that he did not report the alleged sexual assault by Mr. Hannon until three months later, when he was brought in for questioning about his own alleged sexual improprieties with another boy. We further hold that reversible error occurred when the trial court prohibited the defense expert from testifying concerning her psychological evaluation of Mr. Hannon, the results of the evaluation and her conclusions. We find no error in the district court's denial of the motion to suppress Mr. Hannon's statements to law enforcement.

## ISSUES

[¶ 2] Mr. Hannon raises the following issues:

*ISSUE I*

Whether the trial court's order prohibiting Mr. Hannon to impeach TB regarding issues of possible bias violated Mr. Hannon's constitutional right to confront the witness against him and was not harmless error beyond a reasonable doubt?

*ISSUE II*

Whether the trial court committed reversible error when it denied Mr. Hannon's motion to suppress because he invoked his right to counsel and his statements were not given voluntarily?

*ISSUE III*

Whether the trial court erred when it ruled that Dr. Wells could not testify to Mr. Hannon's mental state and the effect thereof on his statements? Whether the erroneous exclusion of Dr. Wells' testimony was not harmless error?

## FACTS

[¶ 3] On October 9, 2001, during an interview concerning allegations that he was involved in inappropriate sexual conduct with another boy, thirteen-year-old TB told Campbell County Sheriff's Deputy Duane Peyrot that Mr. Hannon had sexually assaulted him while staying at his home that summer. Based upon information obtained from TB's mother that Mr. Hannon was from the Rapid City, South Dakota, area, Deputy Peyrot contacted the Rapid City Police Department. Later that day, Deputy Peyrot received a telephone call from Deputy Brian Mueller of the Rapid City, Pennington County, sexual assault task force who confirmed that Mr. Hannon lived in the Rapid City area and offered to conduct a video-taped interview of Mr. Hannon.

[¶ 4] On October 12, 2001, Deputy Mueller interviewed Mr. Hannon. During the interview, Mr. Hannon made incriminating statements about the alleged sexual assault of TB. Deputy Mueller advised the Campbell County Sheriff's Office about the interview, which then issued a felony information charging Mr. Hannon with two counts of third-degree sexual assault, one count of attempted third-degree sexual assault, and two counts of second-degree sexual assault or attempted second-degree sexual assault. The information also alleged that Mr. Hannon was a habitual criminal, making any sentence he received on the counts charged subject to enhancement under Wyo. Stat. Ann. § 6–10–201 (LexisNexis 2003).

[¶ 5] Mr. Hannon initially entered a plea of not guilty to the charges. Later, however, he added a plea of not guilty by reason of mental illness or deficiency. The trial court

ordered Mr. Hannon to be evaluated at the Wyoming State Hospital. Psychologists concluded that "[a]lthough Mr. Hannon is cognitively slow, and may even meet criteria for borderline intellectual functioning or mild mental retardation," he was not suffering from a mental deficiency at the time of the alleged offense making him unable to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of law as required by Wyo. Stat. Ann. § 7–11–304(a) (LexisNexis 2003).[1]

[¶ 6] Mr. Hannon requested a second evaluation, which was performed by Dr. Jane Wells. A confidential report of her findings was filed with the trial court on April 15, 2002. On May 8, 2002, the prosecution moved to strike her evaluation and report and to exclude her testimony, contending she did not comply with the court's order by rendering an opinion as to whether at the time of the alleged criminal conduct Mr. Hannon lacked substantial capacity to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of law. Instead, the state asserted, Dr. Wells rendered an opinion on Mr. Hannon's competency to confess during the interview with Deputy Mueller. The state requested a competency hearing pursuant to Wyo. Stat. Ann. § 7–11–303(f) (LexisNexis 2003).[2] Additionally, the state filed a motion in limine for an order prohibiting the defense from referring to Dr. Wells' evaluation and opinions about whether Mr. Hannon's statements during the interview were voluntary.

[¶ 7] After the competency hearing on June 3, 2002, the trial court found that Mr. Hannon was competent and fit to proceed with the trial. At a subsequent hearing on July 10, 2002, the trial court heard testimony from Dr. Wells in relation to the state's motion to strike her evaluation and exclude her testimony on the issue of whether Mr. Hannon's statements to Deputy Mueller were voluntary. The trial court granted the motion and entered an order excluding Dr. Wells' testimony.

[¶ 8] Prior to trial, Mr. Hannon filed a motion to suppress the statements he made during the interview with Deputy Mueller. Mr. Hannon contended, first, that Mr. Mueller impermissibly continued questioning him after he requested to speak to an attorney and, second, his statements were not voluntary under the totality of the circumstances given his low cognitive functioning and resulting susceptibility to leading and deceptive questioning by authority figures. After a hearing, the trial court denied the motion and the prosecution presented evidence of the interview at trial, including the videotape.

[¶ 9] Also prior to trial, the state filed a motion in limine for an order prohibiting the defense from making any reference during the trial to TB's alleged inappropriate sexual conduct with another child or the juvenile proceedings resulting from those allegations. Mr. Hannon objected on the ground that granting the motion would deprive him of his right to confront the witnesses against him. Mr. Hannon argued he had the right to cross-examine TB concerning the allegations in order to show TB's motivation to lie as a way of shifting blame from his own conduct. After a hearing on the motion, the trial court granted the state's motion and prohibited the defense from making any reference to the allegations against TB.

---

1. Section 7–11–304(a) provides: "A person is not responsible for criminal conduct if at the time of the criminal conduct, as a result of mental illness or deficiency, he lacked substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law. As used in this section, the terms mental illness or deficiency mean only those severely abnormal mental conditions that grossly and demonstrably impair a person's perception or understanding of reality and that are not attributable primarily to self-induced intoxication as defined by W.S. 6–1–202(b)."

2. Section 7–11–303(f) provides: "If neither the state, nor the accused or his counsel contests the opinion referred to in paragraph (c)(iii) of this section relative to fitness to proceed, the court may make a determination and finding of record on this issue on the basis of the report filed or the court may hold a hearing on its own motion. If the opinion relative to fitness to proceed is contested the court shall hold a hearing on the issue. The report or reports may be received in evidence at any hearing on the issue. The party contesting any opinion relative to fitness to proceed has the right to summon and cross-examine the persons who rendered the opinion and to offer evidence upon the issue."

[¶ 10] Trial was held July 15 through July 17, 2002, and Mr. Hannon was convicted on all five counts. He chose to forego the habitual offender trial and pleaded guilty to being a habitual offender. With enhancements under the habitual criminal statute, he received two life sentences on the second-degree sexual assault convictions and three sentences of ten to fifteen years in the Wyoming State Penitentiary on the third-degree sexual assault and attempted third-degree sexual assault convictions, all sentences to run consecutively.

## STANDARD OF REVIEW

■ [¶ 11] Mr. Hannon's claim that he was denied the right to cross-examine TB arises under the Sixth Amendment to the United States Constitution, which guarantees an accused the right to confront the witnesses against him. Issues arising under the constitution are questions of law. We review questions of law de novo and afford no deference to trial court determinations on such questions. Restrictions on the right to confront witnesses are subject to the harmless error analysis. *Van Riper v. State,* 882 P.2d 230, 236 (Wyo.1994), citing *Arizona v. Fulminante,* 499 U.S. 279, 306–07, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).

■ [¶ 12] Typically, we review trial court rulings on motions to suppress de novo, giving deference to the trial court's findings of fact and credibility determinations. *Urbigkit v. State,* 2003 WY 57, ¶ 9, 67 P.3d 1207, ¶ 9 (Wyo.2003). Here, however, although Mr. Hannon argued in his motion to suppress that the interview was custodial, the trial court made no findings in that regard.[3] We are left, therefore, to review the issue de novo. The following standards apply to Mr. Hannon's claim that the trial court erred in denying his motion to suppress his statements to law enforcement:

A trial court's ruling on a defendant's motion to suppress a statement on the grounds that it was involuntary, is reviewed de novo. In conducting such a review, we defer to the trial court's find-

ings of fact unless those findings are clearly erroneous. This Court considers all the evidence in the light most favorable to the trial court's determination because the trial court has the opportunity to hear the evidence and to assess the credibility of witnesses. The Fifth and Fourteenth Amendments to the United States Constitution, and Wyoming Constitution Article 1, §§ 6 and 11, require that confessions be voluntary. A statement that is obtained by coercion is not trustworthy and may not be used at trial against the person who made it. A defendant is deprived of the right to due process of law if an involuntary statement is admitted at his trial. A statement is considered to be voluntary if the defendant of his own free and deliberate choice, and not because of intimidation, coercion or deception, makes it. The prosecution has the burden to prove, by a preponderance of the evidence, that a defendant's statement is voluntary. *Edwards v. State,* 973 P.2d 41, 48 (Wyo.1999).

*Lara v. State,* 2001 WY 53, ¶ 9, 25 P.3d 507, ¶ 9 (Wyo.2001).

■ [¶ 13] Mr. Hannon's final claim, that the trial court erred in excluding Dr. Wells' expert testimony, raises constitutional and evidentiary issues. As we have stated, constitutional issues are questions of law, which we review de novo. Evidentiary issues are reviewed for abuse of discretion, meaning Mr. Hannon must demonstrate that the trial court reasonably could not have concluded as it did. *Urbigkit,* ¶ 39. The trial court's ruling excluding the expert testimony also implicates *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In that regard, we have adopted that said by the United States Supreme Court:

The trial court must have the same kind of latitude in deciding how to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides whether or not that expert's relevant testimony is reliable....

---

3. W.R.Cr.P. 12(f) requires the trial court to state its essential findings on the record where such findings are involved in determining a motion.

Here, the trial court made no factual findings on the record at the hearing or in its order denying the motion to suppress.

[A] court of appeals is to apply an abuse-of-discretion standard when it "reviews a trial court's decision to admit or exclude expert testimony." That standard applies as much to the trial court's decisions about how to determine reliability as to its ultimate conclusion ... Thus, whether Daubert's specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine. *Kumho Tire Company, Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

*Bunting v. Jamieson,* 984 P.2d 467, 470 (Wyo.1999).

## DISCUSSION

### 1. Right to confront witnesses

[¶ 14] Mr. Hannon claims the trial court violated his constitutional right to confront the witnesses against him when it prohibited him from cross-examining TB about the fact that he did not report the sexual assault by Mr. Hannon until several months later when he was being questioned by law enforcement concerning allegations that he had inappropriate sexual contact with another boy. The purpose of the prohibited cross-examination was to show that TB was motivated to make false accusations against Mr. Hannon in an attempt to shift the focus of the inquiry away from his own improper conduct. In support of his claim, Mr. Hannon cites *Davis v. Alaska,* 415 U.S. 308, 315, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), in which the United States Supreme Court held that cross-examination is the primary right protected by the Sixth Amendment.

[¶ 15] The state asserts this case is distinguishable from *Davis* and other cases cited by Mr. Hannon. The state also contends another effective way to show TB's bias was available to and utilized by Mr. Hannon. Although the trial court prohibited defense counsel from cross-examining TB concerning the allegations involving the other boy, the state argues evidence concerning those allegations was presented through Deputy Peyrot, thus providing Mr. Hannon the opportunity to show the jury that TB may have been motivated to falsely accuse him of sexual

improprieties. In the alternative, the state contends any constitutional error that occurred in the denial of cross-examination was harmless. As more fully set forth in the following paragraphs, we hold that the trial court erred in prohibiting the defense from presenting its theory of defense and that such error was not harmless beyond a reasonable doubt.

[¶ 16] The Sixth Amendment to the United States Constitution and Article 1, § 10 of the Wyoming Constitution guarantee the right of an accused to confront the witnesses against him. The primary right secured by the Confrontation Clause is the right of cross-examination. *Davis,* 415 U.S. at 315, 94 S.Ct. 1105.

Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, *i.e.,* discredit, the witness. One way of discrediting the witness is to introduce evidence of a prior criminal conviction of that witness. By so doing the cross-examiner intends to afford the jury a basis to infer that the witness' character is such that he would be less likely than the average trustworthy citizen to be truthful in his testimony. The introduction of evidence of a prior crime is thus a general attack on the credibility of the witness. A more particular attack on the witness' credibility is [a]ffected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand. The partiality of a witness is subject to exploration at trial, and is "always relevant as discrediting the witness and affecting the weight of his testimony." 3A J. Wigmore, Evidence § 940, p. 775 (Chadbourn rev.1970). We have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitution-

ally protected right of cross-examination. *Greene v. McElroy*, 360 U.S. 474, 496, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959).

*Id.* at 317–18, 94 S.Ct. 1105.

[¶ 17] In *Davis*, the defense sought to show that the witness's bias and prejudice caused him to falsely identify the defendant as the perpetrator of the alleged crime. The Court said:

> We cannot speculate as to whether the jury, as sole judge of the credibility of a witness, would have accepted this line of reasoning had counsel been permitted to fully present it. But we do conclude that the jurors were entitled to have the benefit of the defense theory before them so that they could make an informed judgment as to the weight to place on [the witness]'s testimony which provided "a crucial link in the proof ... of petitioner's act." *Douglas v. Alabama*, 380 U.S., at 419, 85 S.Ct. 1074, 13 L.Ed.2d 934. The accuracy and truthfulness of [the] testimony were key elements in the State's case against petitioner. The claim of bias which the defense sought to develop was admissible to afford a basis for an inference of undue pressure because of [the witness]'s vulnerable status as a probationer, cf. *Alford v. United States*, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1931), as well as [his] possible concern that he might be a suspect in the investigation.
>
> We cannot accept the [trial court]'s conclusion that the cross-examination that was permitted defense counsel was adequate to develop the issue of bias properly to the jury. While counsel was permitted to ask [the witness] whether he was biased, counsel was unable to make a record from which to argue *why* [the witness] might have been biased or otherwise lacked that degree of impartiality expected of a witness at trial. On the basis of the limited cross-examination that was permitted, the jury might well have thought that defense counsel was engaged in a speculative and baseless line of attack on the credibility of an apparently blameless witness or, as the prosecutor's objection put it, a "rehash" of prior cross-examination. On these facts it seems clear to us that to make any such

inquiry effective, defense counsel should have been permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness. Petitioner was thus denied the right of effective cross-examination....

*Davis*, 415 U.S. at 317–18, 94 S.Ct. 1105.

[¶ 18] Subsequently, in *Delaware v. Van Arsdall*, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986), the Court reaffirmed *Davis*, and held that "a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors ... could appropriately draw inferences relating to the reliability of the witness.'" *Van Arsdall*, 475 U.S. at 680, 106 S.Ct. 1431. The Court concluded, "it is plain to us that '[a] reasonable jury might have received a significantly different impression of [the witness'] credibility had [defense counsel] been permitted to pursue his proposed line of cross-examination.'" *Id.*

[¶ 19] Then again, in *Olden v. Kentucky*, 488 U.S. 227, 232, 109 S.Ct. 480, 102 L.Ed.2d 513 (1988), the Court held that although a trial court may impose reasonable limits on defense counsel's inquiry into the potential bias of a prosecution witness, taking into account such factors as harassment, prejudice, confusion of the issues, the witness' safety, or repetitive or only marginally relevant interrogation, the limitation on Mr. Olden's right to cross examine went too far. Mr. Olden, a black man, was charged with raping a white woman. He claimed the woman engaged in consensual sex with him and concocted the rape story in order to keep another man with whom she was having an affair from knowing. The trial court prohibited the defense from introducing any evidence of the affair, including cross-examination of the victim or her lover, on the ground that the danger of unfair prejudice from juror bias concerning inter-racial relationships outweighed any probative value. The Supreme Court reversed, holding the fear of

prejudice did not justify exclusion of cross-examination with such strong potential to demonstrate the falsity of the victim's testimony. *Id.*

[¶ 20] Like the United States Supreme Court, this Court has considered claims of denial of the right to confront witnesses on a number of occasions. In *Connor v. State,* 537 P.2d 715, 717 (Wyo.1975), we said "[t]he principal thrust of [*Davis* ] is the holding that the confidentiality granted to a juvenile and to all proceedings involving him ... must yield to the right of effective cross-examination under the Sixth Amendment." To that end, we said, the defendant must be allowed to develop such evidence as exists in the juvenile court record to show possible bias or prejudice. *Id.* We subsequently applied *Davis* in *Salaz v. State,* 561 P.2d 238, 241 (Wyo.1977) to hold that there was no denial of the right to confrontation where the witness's possible bias was clearly established from other evidence presented and the juvenile record would have added nothing.

[¶ 21] Seven years later, in *Amin v. State,* 686 P.2d 593, 596 (Wyo.1984) we examined *Davis* in relation to W.R.E. 609(d) [4] and said:

> [t]hree critical factors which should be considered in determining whether to permit use of a prior juvenile record for the purpose of showing bias are: "(1) the probationary status of the witness, (2) some suspicion focusing on the witness, and (3) the witness's motives to please the prosecution." When, in addition to the above factors, the witness is either the chief prosecution witness, the only eyewitness to the crime, or the only witness whose testimony connects the defendant with the crime, courts generally ought to allow cross-examination concerning the juvenile record and its introduction into evidence. (citations omitted).

Because the witness was not on probation, was not a suspect and was not the state's only witness, we held in *Amin* that the trial

court did not abuse its discretion in prohibiting cross-examination of the victim concerning a two-year-old juvenile conviction and pending charge in another state. We said, "there was not a scintilla of evidence that the witness might benefit in any way with respect to that charge" from his testimony in Amin's trial.

[¶ 22] In addition to these Wyoming cases, Mr. Hannon cites us to *United States v. DeSoto,* 950 F.2d 626 (10th Cir.1991) in which the court held that the trial court's curtailment of cross-examination of one of the government's witnesses deprived the defendant of his Sixth Amendment right of confrontation and was not harmless error. In *DeSoto,* the defendant was charged with being a felon in possession of a firearm. The government had only one witness who could testify that the defendant had actual possession of the pistol. Without her testimony, the government's case against DeSoto was not strong. The trial court prohibited defense counsel from attempting to impeach the witness by showing she was motivated to lie in order to get back at DeSoto for accusations he made against her boyfriend. The court of appeals stated:

> The confrontation clause of the sixth amendment guarantees defendants in criminal cases the right "to be confronted with the witnesses against" them. Its main purpose is to provide defendants with the opportunity for effective cross-examination. One of the most important aspects of the right of cross-examination is attacking the witness' credibility and the truth of the testimony. Credibility may be tested by interrogation that attempts to reveal possible biases, prejudices, or ulterior motives.
>
> Defense counsel should ordinarily be given wide latitude when cross-examining a witness about credibility or bias. Counsel should be allowed to "expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to

4. W.R.E. 609(d) provides: "Juvenile Adjudications. Evidence of juvenile adjudications is generally not admissible under this rule. The court may, however, in a criminal case allow evidence of a juvenile adjudication of a witness other than

the accused if conviction of the offense would be admissible to attack the credibility of an adult and the court is satisfied that admission in evidence is necessary for a fair determination of the issue of guilt or innocence."

the reliability of the witness." The trial court, however, retains discretion to reasonably limit cross-examination to prevent, among other things, questioning that is repetitive or of marginal relevance.

In this case, the district court ruled that the cross-examination was irrelevant. Questions properly directed at revealing bias are, however, a permissible basis of impeachment, and are relevant and admissible. The issue before us, therefore, is whether the questions asked during cross-examination were relevant in terms of showing [the witness'] possible bias against defendant. We conclude that they were.

... Had counsel been allowed [cross-examination], the jury could have reasonably inferred [the witness] was loyal to [her boyfriend] and that her testimony was in retaliation for defendant's accusation against him. At the least, this line of question would have cast doubt on her credibility by exposing a motive for her to slant her testimony against defendant.

*Id.* at 629–30 (citations omitted).

[¶ 23] The state cites *United States v. Williams*, 963 F.2d 1337 (10th Cir.1992) in support of its claim that the cross-examination was properly disallowed. In that case, the trial court prohibited cross-examination of two government witnesses concerning their juvenile records. On appeal, the defense relied on *Davis* in asserting the trial court erred. The court of appeals upheld the ruling, finding *Davis* distinguishable in several important respects: first, the witness in *Davis* was on probation and the witnesses in *Williams* were not; second, the witness in *Davis* was the key witness for the government and the witnesses in *Williams* were not; and, third, the defense in *Davis* did not have effective means of attacking the witness's credibility other than the juvenile adjudication and probationary status, while in *Williams* the defense introduced substantial evidence to attack the witnesses' credibility. *Williams*, 963 F.2d at 1340–41. On this basis, the court held the defendant's ability to effectively cross-examine the witnesses was not substantially impaired. *Id.*

■ [¶ 24] Having carefully reviewed the above cases, we find Mr. Hannon's argu-

ment to be the more compelling one. As in *Davis* and *DeSoto*, the witness Mr. Hannon sought to cross-examine was the state's material witness. TB was the only witness to the alleged crime. There was no physical evidence tying Mr. Hannon to the alleged assault nor were there any eyewitnesses. TB did not report the allegations of sexual assault by Mr. Hannon until three months after the fact when he was brought in for questioning about his own sexual improprieties with another boy. Had defense counsel been allowed to explore this issue with TB during cross-examination, the jury reasonably might have inferred TB was fearful about what would happen to him as a result of his own acts and concocted the allegations against Mr. Hannon to shift the focus of the police inquiry away from him. At the least, this line of questioning could have cast doubt on his credibility by exposing a motive for him to accuse Mr. Hannon. We conclude the prohibited cross-examination was sufficiently probative of a possible ulterior motive to warrant allowing it and the trial court's ruling denied Mr. Hannon the opportunity to fully explore this before the jury thereby depriving him of his Sixth Amendment right of confrontation.

■ [¶ 25] Not all constitutional errors require reversal, however. The improper denial of a defendant's opportunity to confront witnesses against him is subject to the harmless-error analysis. *Van Arsdall*, 475 U.S. at 684, 106 S.Ct. 1431. Thus,

[t]he correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination oth-

erwise permitted, and, of course, the over-all strength of the prosecution's case.

*Olden,* 488 U.S. at 233, 109 S.Ct. 480.

[¶ 26] As mentioned above, the Tenth Circuit Court of Appeals applied the *Van Arsdall* factors in *DeSoto* to hold that denial of the defendant's right to cross-examination was not harmless error. Because the witness in *DeSoto* provided the only evidence that the defendant had actual possession of the gun, there was no corroborating testimony, there was no real opportunity to explore the witness's motives in other cross-examination and without the testimony the government's case was not particularly strong, the court concluded the error was not harmless beyond a reasonable doubt.

[¶ 27] We likewise have applied the *Van Arsdall* factors in deciding whether error in limiting cross-examination is harmless beyond a reasonable doubt. In *Story v. State,* 721 P.2d 1020, 1039 (Wyo.1986), we reversed a conviction for assault and battery with intent to rape based on our conclusion that the trial court's restriction on cross-examination of the victim and only corroborating witness was not harmless beyond a reasonable doubt. We said:

> It would be impossible for us to conclude that the trial court's restrictions on defense counsel's cross-examination of HF and MF were harmless beyond a reasonable doubt. HF's accusation was not corroborated by any physical evidence or by the testimony of any witness other than MF. The jury's decision that appellant assaulted and battered HF with intent to rape her was based entirely on the testimony of HF and MF. Their credibility was crucial to the prosecution's case.

*Id.* at 1040.

[¶ 28] Likewise, no physical evidence corroborated TB's accusations against Mr. Hannon in this case. And, unlike the situation in *Story,* there was no corroborating witness. The jury's decision that Mr. Hannon sexually assaulted TB was based almost entirely on TB's testimony and Mr. Hannon's own less than definitive statements during the police interview. TB's credibility was crucial to the state's case.

[¶ 29] The state argues any error in the trial court's ruling was harmless because although it prohibited defense counsel from cross-examining TB concerning the allegations against him, evidence concerning those allegations was presented through Deputy Peyrot, thus providing Mr. Hannon the opportunity to show the jury that TB may have been motivated to falsely accuse him. The fallacy in the state's argument is that the trial court ruled that once the state presented Deputy Peyrot's testimony concerning the allegations against TB, the defense was prohibited from making any further reference to the allegations or the juvenile proceedings that followed. By this ruling, the trial court blocked other avenues otherwise available to the defense for presenting its theory of the case, such as through cross-examination of Deputy Peyrot or the state's expert psychologist who testified that TB's behavior was consistent with that of other sexual abuse victims. Although the trial court instructed the jury at the close of the evidence concerning Mr. Hannon's theory of the case and that it should find Mr. Hannon not guilty if the evidence supported the theory, its prior ruling disallowing such evidence predetermined the result with respect to the instruction—no evidence was allowed so the theory was unsupported.

[¶ 30] As in *Douglas v. Alabama,* 380 U.S. 415, 420, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965), "this case cannot be characterized as one where the prejudice in the denial of the right of cross-examination constituted a mere minor lapse. The alleged statements clearly bore on a fundamental part of the State's case against petitioner." The error was not harmless beyond a reasonable doubt. We, therefore, are compelled to reverse Mr. Hannon's conviction on the basis of this violation of his constitutional right to confrontation.

## 2. Denial of the Motion to Suppress Videotaped Interview

[¶ 31] Mr. Hannon's claim that the trial court erred in denying his motion to suppress is twofold. First, he claims he unequivocally invoked his right to counsel and the interview should have been terminated. Second, he

claims his statements were not voluntary. The state contends the interview was non-custodial so Mr. Hannon's right to counsel was not implicated and, even if it was custodial, his request was equivocal and did not require Deputy Mueller to stop the questioning. The state also contends Mr. Hannon's confession was voluntary in that the totality of the circumstances demonstrate that his statements were not coerced but were the product of his deliberate choice. Before addressing these claims, we look more closely at what occurred during the interview.

### a. The interview

[¶ 32]  Mr. Hannon came to the Pennington County, South Dakota sheriff's department at the request of Deputy Mueller. No evidence was presented that he did so against his will. The only evidence in this regard was that Deputy Mueller went to the home of Kathy Marcus, with whom Mr. Hannon was staying, and asked to talk with Mr. Hannon. Ms. Marcus informed him Mr. Hannon was sleeping because he had been at the hospital during the night after getting gasoline in his eyes at work. Deputy Mueller asked Ms. Marcus if she would bring Mr. Hannon to the sheriff's office to speak with him after he woke up. Later that morning, Ms. Marcus arrived at the sheriff's office with Mr. Hannon.

[¶ 33]  At the start of the interview, Deputy Mueller told Mr. Hannon he was free to leave at any time and did not have to answer any questions he did not want to answer. In response, Mr. Hannon indicated he did not have any questions. Mr. Hannon was not under arrest and, in fact, Deputy Mueller advised him that he would not be arrested that day. Deputy Mueller did not advise Mr. Hannon of his Miranda rights. There is no evidence Mr. Hannon conferred with an attorney or anyone else before the interview. During the interview, however, just after Deputy Mueller advised him that he was being questioned in regard to events involving TB, Mr. Hannon stated that if he was going to be charged, he needed to go see his lawyer. We set out this exchange in full:

BM: Okay. Do you know why I'm interviewing you here today?  Do you have a pretty good idea?

AH: I have no clue.

BM: Something happened when you were at Gale's house with [TB]. The night that you stayed in [TB]s' bedroom.

AH: Oh, he (unintelligible)

BM: There's some things that have happened and we've done some things and you know some things, okay, that have happened and I think that you're a, I think that you're a man who needs some help.  Okay? And I would like to give you some help, okay?  Right now [TB] needs some help about what happened, okay? And I know that this is something that I don't think you wanted to have happen—I think it's something that just happened and it's over with and now we have to deal with it okay? And I know that you know why you're down here.  We just need to get this out in the open and we need to deal with it for your sake and for [TB's] sake, alright?  These types of things happen sometimes and we've gotta deal with it, okay?  So, [TB] has told us what happened in there and I'm not real sure why and I kind of wanted to get some insight as to maybe your past and stuff—what would make you do something like this.  I know that you're the type of guy who feels bad about this and probably would want to help [TB] out at this point because he's having some problems with it.  And so, that's our main concern is getting [TB] some help, okay?

AH: My eyes (unintelligible) you're just blurry to me right now.

BM: That's okay.  But you know what I'm talking about though?  I know that you know what I'm talking about.

AH: I know my past.  I know that.

BM: I know some bad things have happened to you.

AH: And I've been working good.  I've been keeping my nose clean.

BM: I know, but you slipped up at Gale's house with [TB] and we need to get that all out in the open. Okay? And I know what happened, I know everything that happened in that bedroom that night.

AH: *Well, if I'm going to be charged I need to go see my lawyer.*

BM: *You can see your lawyer if you want. I'm not charging you out with anything, I just want to know what happened.*

AH: I ain't done nothing, man. Okay? That's all I know. I know I laid on the floor and I fell asleep.

BM: Can I tell you what's alleged here? Do you want to know what's been alleged?

AH: *So I can tell my lawyer?* 'Cause I ain't done nothing.

Deputy Mueller then proceeded to tell Mr. Hannon about TB's allegations and the questioning continued until Mr. Hannon stated, "I want to go talk to my lawyer now." The interview ended at that point.

[¶ 34] Initially during the interview, Mr. Hannon denied that anything untoward happened with TB. As Deputy Mueller persisted with statements to the effect that he knew what happened the night Mr. Hannon stayed in TB's bedroom, he wanted to help Mr. Hannon and he believed Mr. Hannon did not want to hurt anyone, Mr. Hannon made the statement, "I probably done something, I probably jacked off or masturbated but I . . . didn't think he was awake or anything probably, I don't know."

[¶ 35] Deputy Mueller then told Mr. Hannon the sheriff's office found his pubic hair in TB's bed, a statement that was not true. Deputy Mueller asked Mr. Hannon if it was possible he did not know TB was in the bed and accidentally rubbed his penis against him. Mr. Hannon responded, "I don't know. Probably, to tell you the truth, probably right." Thereafter, a series of questions and answers ensued in which Mr. Hannon discussed his attempts that night to have sexual intercourse with TB's mother. Deputy Mueller suggested that Mr. Hannon was con-fused and actually made those attempts with TB. The following exchange occurred:

MB: * * * You remember trying to have sex with Gale?

AH: Having sex with Gale, yea.

MB: Do you think it's possible that you got mixed up and it was [TB]?

AH: Probably. Then if it is, I feel guilty.

BM: If that's what happened then we can deal with that.

AH: If it happened, then I, if I feel guilty then I really do.

BM: Let me tell you what happened and you can explain it. First of all, I know that you were masturbating in the room. That you were masturbating in front of [TB]. And I know that you tried to get [TB] to suck your penis. I know that that happened. Do you remember maybe trying to have Gale suck your penis?

AH: Yea.

BM: You do? Is it possible it that it was [TB]?

AH: Probably. I'm sorry man. I feel guilty.

BM: One thing I know happened also is that you sucked [TB's] penis.

AH: I was trying to have sex with Gale.

BM: You sucked [TB's] penis, I know that happened. Okay? Do you remember that?

AH: No, I just wanted to go down on Gale. I know that.

BM: Do you think you might have tried to go down on Gale, that it was [TB] instead?

AH: Probably, probably.

Numerous questions followed in which both Deputy Mueller and Mr. Hannon referred to "Gale" or "her" as the subject of Mr. Hannon's attentions, culminating in Deputy Mueller asking, "If it was [TB] by mistake, do you think [TB] sucked your penis?" Mr. Hannon responded, "probably." However, when Deputy Mueller asked "Do you think so, do you remember that?" Mr. Hannon responded, "I don't see [TB] there. I see Gale." More questioning ensued concerning

Mr. Hannon's actions with "Gale" and then Deputy Mueller stated:

> I can see, I can see how in your mind you tried to make this be Gale, okay? You wanted to have sex with Gale and I can see how that happened, okay? Okay? I can see how that happened, how you wanted to have sex with Gale but she's not wanting to have sex with you. I know that you know that was [TB], okay? Now this is a common thing okay, so don't feel like you're the first person who has ever come in here and had to talk about this before because this is a common thing. Sometimes people want to have sex and they, you know, frankly, they need to have sex and they don't care whose there at the time. They're going to make that person be who they want them to be, okay? And that's what happened here, I know that it is. I think that in reality that you really wanted to have sex with Gale and she didn't want to and I know that you know that you had sex with [TB] and I know that you feel bad about that.

After these comments, Mr. Hannon responded with the words "yea" or "probably" to many of Deputy Mueller's questions about attempting particular acts with TB. At times during the questioning that followed, however, Mr. Hannon slipped back into saying "Gale" while Deputy Mueller continued to reference TB. The following excerpt from the transcript illustrates what occurred:

> BM: Right, but you're in [TB's] bedroom on the floor now, right?
>
> AH: Yea.
>
> BM: So what do you do first?
>
> AH: I know, I was having, I know it was Gale and I know I was taking her clothes and stuff off.
>
> BM: So you took [TB's] clothes off.
>
> AH: And so ... I took [TB's] clothes off and started playing around....

\* \* \*

> BM: Okay. Then what happened next?
>
> AH: And I know, I know I turned her over. I know that. And I know I masturbated. I know that. But see,

I don't know if I masturbated on her or on a towel. I don't remember.

\* \* \*

> BM: I know that you want to say it was her but we know this was [TB] that this happened with, right?
>
> AH: Right.
>
> BM: So don't say Gale, okay? Let's ... I mean, let's bring it back, let's get out of the imaginative world and we have to use the right words here. This is [TB] that we're talking about.

Thereafter, Mr. Hannon made no further references to Gale or "her" but only to TB or "him". In response to Deputy Mueller's questions about various acts he attempted with TB, Mr. Hannon responded "yea" or "probably" and in some instances provided more detailed responses. After some minutes of this, Mr. Hannon stated that he wanted to go talk to his lawyer.

[¶ 36] All of the incriminating statements by Mr. Hannon were made in the course of the interview. Deputy Mueller made no overt or implied threats and made no direct promises during the interview. He did, however, tell Mr. Hannon that he wanted to help him and would not charge him with anything. He also told Mr. Hannon law enforcement found physical evidence tending to prove he was in TB's bed when in fact such evidence did not exist.

[¶ 37] Deputy Mueller comported himself at all times during the thirty-minute interview in a quiet, polite manner. He conducted the interview in a small room with padded walls. The door was closed throughout the interview and both men were seated in chairs facing each other across the corner of a table. Deputy Mueller's back was to the camera. Mr. Hannon wore dark glasses throughout the interview, apparently due to the eye injury he suffered the night before. He indicated a couple of times during the interview that his eyes were bothering him but also said he was okay and aware of what was happening. His responses to Deputy Mueller's questions were slow and monosyllabic, frequently consisting of "yea" or "probably." Even after Mr. Hannon made incrimi-

nating statements, Deputy Mueller did not read him his rights under *Miranda.*

[¶ 38] Although on appeal much is made of Mr. Hannon's mental capacity, the trial court prohibited the testimony of the defense expert in that regard. Thus, the defense was unable to present any direct evidence at trial that Mr. Hannon's low I.Q. made him susceptible to suggestions by law enforcement. The only evidence presented bearing on that theory was Ms. Marcus's testimony that Mr. Hannon was disabled and received social security payments for which she was the payee, meaning she used the payments to take care of his bills for him. She also testified that he was a shy man who was easily taken advantage of by his friends.

### b. Invoking right to counsel

[¶ 39] Mr. Hannon claims the interview should have ceased after he said: "if I'm going to be charged, I need to go see my lawyer." In addressing his claim, we must determine first whether Mr. Hannon was in custody during the interview so as to make applicable the right to counsel recognized in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). If he was not in custody, and the interview was non-custodial, the rights recognized in *Miranda* did not apply and he had no right to counsel.

▇▇▇▇ [¶ 40] As expressed by the United States Supreme Court, *Miranda* set forth rules of police procedure applicable to custodial interrogation. *Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). Custodial interrogation means questioning initiated by law enforcement after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. *Id.; Gunn v. State,* 2003 WY 24, ¶ 8, 64 P.3d 716, ¶ 8 (Wyo.2003).

> [P]olice officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody." It

was *that* sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited.

*Mathiason,* 429 U.S. at 495, 97 S.Ct. 711. Applying these principles, the United States Supreme Court held in *Mathiason* that the defendant was not in custody where he came to the police station voluntarily, was immediately informed he was not under arrest and left the station without hindrance at the close of a thirty-minute interview.

▇▇▇▇ [¶ 41] The determination of whether a defendant was or was not in custody at the time of questioning decides whether he was entitled to counsel because, although a request for a lawyer during custodial interrogation is sufficient to invoke the privilege against self-incrimination, a person has no right to have an attorney present during a non-custodial interview. *Minnesota v. Murphy,* 465 U.S. 420, 424, fn. 3, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984). In the latter circumstance, law enforcement is not required to stop the interview and provide the defendant with an attorney. *Ohio v. Coleman,* 2002 Ohio 2068. As stated by another court:

> It is the right to an attorney *during custodial interrogation* that *Miranda* and its progeny protect. That right does not exist outside the context of custodial interrogation. One cannot invoke a right that does not yet exist.

*People v. Villalobos,* 193 Ill.2d 229, 250 Ill. Dec. 17, 737 N.E.2d 639, 645 (2000). *See also, Commonwealth v. Carter,* 1998 Va. Cir. LEXIS 277 (the defendant's request that questioning cease in a non-custodial setting did not preclude continued police questioning); *State v. Relford,* 9 Neb.App. 985, 623 N.W.2d 343, 348 (2001) (the Miranda right to counsel cannot be anticipatorily invoked prior to custodial interrogation; in order to invoke the Miranda right to counsel, an individual must be both in custody and subject to interrogation.) Like these courts, this Court adheres to the principle that the rights recognized in *Miranda,* including the right to counsel, apply only in the context of custodial interrogation. *Roderick v. State,* 858 P.2d 538, 546 (Wyo.1993); *Glass v. State,* 853 P.2d

972, 976 (Wyo.1993); *Solis v. State*, 851 P.2d 1296, 1298 (Wyo.1993)

[¶ 42] In determining what constitutes custodial interrogation, the relevant inquiry is whether a reasonable person in the suspect's position would have understood he was free to leave. *Glass*, 853 P.2d at 976. The totality of the circumstances must be considered in determining whether a suspect is in custody when questioned. *Gunn*, ¶ 12. Among the factors considered are: (1) whether a suspect is questioned in familiar or neutral surroundings; (2) the number of police officers present; (3) the degree of physical restraint and whether it is comparable to that associated with a formal arrest; and (4) the duration and character of the interrogation. *Id.*, ¶ 9.

> The nature of the interrogator, the nature of the suspect, the time and place of the interrogation, the progress of the investigation at the time of the interrogation, whether the suspect is informed that his detention would not be temporary, and the elapsed amount of time between questioning and the arrest may be important factors as well. No one factor alone will necessarily establish custody for *Miranda* purposes, and not all factors will be relevant to a given case.

*Id.* (citations omitted).

[¶ 43] We have considered these factors in several cases in determining whether questioning by law enforcement constituted custodial interrogation within the meaning of *Miranda*. Most recently, in *Gunn*, we held that questioning was not custodial where law enforcement officers came to the suspect's home, identified themselves and their reason for being there, asked the suspect to come outside where they could speak privately, spoke with him for ten to fifteen minutes without formally arresting, handcuffing or physically restraining him in any way, asked him to go inside and obtain an item of evidence, which he did voluntarily, and then asked him to come to the sheriff's office, which he also did voluntarily. Viewing these facts from the perspective of a reasonable person in the suspect's position, we concluded the interview was not custodial because a reasonable person would have felt at liberty to terminate the interview. *Id.* at ¶ 16.

[¶ 44] Similarly, in *Wunder v. State*, 705 P.2d 333, 335 (Wyo.1985), we applied the reasonable person test in concluding the interview was non-custodial. There, a police officer contacted the defendant at his home, advised him he would not be arrested at that time and then questioned him for fifteen to twenty minutes. We said, "it cannot be said that, at the time of the interview, [the defendant]'s freedom of movement was involuntarily curtailed by the police in any way. A reasonable man in [his] position would not have considered himself to have been in police custody." *Id. Glass*, 853 P.2d at 976 (Wyo.1993), likewise involved a fifteen minute interview conducted at the defendant's home where there was no indication the defendant was not free to leave or ask law enforcement to leave. We held it was non-custodial. *See also, Southworth v. State*, 913 P.2d 444, 449 (Wyo.1996).

[¶ 45] In addition to the above cases considering police interviews conducted at the defendant's residence, we also have considered the issue where questioning occurred in a less friendly, more inherently coercive environment. In *Roderick*, the defendant voluntarily came to the city council chambers at the request of law enforcement for an interview. Before questioning him, the officers told the defendant he was not under arrest and could choose not to speak to them, leave at any time and have an attorney present. The defendant answered questions for one and one-half hours and then asked to leave. Before he left, the officers asked him to be fingerprinted and photographed, and he consented. We held the interview was non-custodial.

[¶ 46] Similarly, in *Kolb v. State*, 930 P.2d 1238, 1243 (Wyo.1996), the defendant voluntarily came to the police station to be interviewed at the request of the police. The defendant was told prior to questioning that he was not under arrest and was free to leave at any time. *Id.* As the defendant's story changed in the course of the interview, the officer advised him of his Miranda rights and re-advised him of those rights as his story continued to evolve. At the time he

confessed to the crime, he had already been advised of his Miranda rights. Over the defendant's claim that he was in custody before confessing because the room was locked and he was deceived into making false confessions, the trial court concluded he was not in custody and we affirmed. *Id.* at 1245.

[¶ 47] In the majority of cases in which a defendant was questioned without being advised under *Miranda,* the courts have held under the totality of circumstances the interrogation was non-custodial. The cases in which the courts reached a different result are distinguishable. For example, in *United States v. Corral–Corral,* 702 F.Supp. 1539, 1546 (D.C.Wyo.1988) the court held a defendant who was handcuffed and placed in a barrow ditch was in custody for purposes of the Fifth Amendment and *Miranda.* In *United States v. DiGiacomo,* 579 F.2d 1211, (10th Cir.1978), the court likewise held that a defendant who was separated from his companion and confronted by four federal agents, who told him he was suspected of passing counterfeit money, to surrender any such money in his possession and to choose between immediate arrest and voluntary appearance at the Secret Service office the following morning, was in custody and Miranda warnings were required. Additionally, in *United States v. Griffin,* 7 F.3d 1512, 1519 (10th Cir.1993), the court held a woman who was separated from her friend and taken to a small private office inside a police-controlled area of the airport and who was not told she could refuse to answer or leave the interview was subjected to custodial interrogation.

[¶ 48] We have carefully reviewed the totality of the circumstances and are persuaded based upon controlling law that Mr. Hannon was not in custody at the time he was interviewed by Deputy Mueller. No evidence was presented that he came to the sheriff's department against his will. He was told he did not have to answer questions, would not be arrested that day and was free to leave at any time. The videotape clearly shows Deputy Mueller spoke quietly and politely. There were no threats, outbursts or hostile accusations. And Mr. Hannon left the station when the interview ended.

[¶ 49] Any claim that a reasonable person in Mr. Hannon's position with his low I.Q. would have believed he was not free to leave is without merit. A defendant's particular traits are not relevant under the applicable objective standard unless law enforcement was aware of and influenced by such traits during the interview. *United States v. Erving,* 147 F.3d 1240, 1248 (10th Cir.1998). No evidence was presented that Deputy Mueller was aware of Mr. Hannon's I.Q. or that he adjusted his tactics on the basis of such awareness. Therefore, Mr. Hannon's I.Q. is not relevant to the issue of whether the interview was custodial for Miranda purposes. Because we hold that Deputy Mueller's questioning of Mr. Hannon was non-custodial and, therefore, Mr. Hannon had no right to have counsel present during the interview, we do not address the question whether his request for counsel was equivocal or unequivocal. We turn next to the question of whether Mr. Hannon's statements during the interview were voluntary.

### c. Voluntariness of statements

[¶ 50] The United States Supreme Court has recognized:

[n]on-custodial interrogation might possibly in some situations, by virtue of some special circumstances, be characterized as one where "the behavior of law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined." ... When such a claim is raised, it is the duty of an appellate court ... "to examine the entire record and make an independent determination of the ultimate issue of voluntariness."

*Beckwith v. United States,* 425 U.S. 341, 347–48, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976) (citations omitted). Thus, the question of whether a confession is voluntary may arise whether or not the defendant was in custody when it was given. *State v. Evans,* 944 P.2d 1120, 1125 (Wyo.1997). As we said in *Black v. State,* 820 P.2d 969, 971 (Wyo.1991), even though the Fifth Amendment and *Miranda* are not implicated where statements are made in a non-custodial setting, the due process clause under Article 1, § 6 of the Wyo-

ming Constitution is an independent limitation on the use of such statements at trial. Therefore, regardless of our conclusion that Deputy Mueller's interview of Mr. Hannon was non-custodial, we must decide whether the statements made by Mr. Hannon during the interview were voluntary.

[¶ 51] Courts apply the following standards in determining whether a defendant's statements were voluntary:

> Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.

*Schneckloth v. Bustamonte,* 412 U.S. 218, 225, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). *See also, Yung v. State,* 906 P.2d 1028, 1034 (Wyo.1995). In determining whether a defendant's will was over-borne in a particular case, the Court has assessed the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation. *Schneckloth,* 412 U.S. at 223, 93 S.Ct. 2041; *Evans,* 944 P.2d at 1125. Among the circumstances considered are the atmosphere and events surrounding the interrogation, such as the use of violence, threats, promises, improper influence or official misconduct, the conduct of the defendant before and during the interrogation and the defendant's mental condition at the time. *Evans,* 944 P.2d at 1125. Other relevant factors include:

> [w]hether the defendant was in custody or was free to leave and was aware of the situation; whether *Miranda* warnings were given prior to any interrogation and whether the defendant understood and waived *Miranda* rights; whether the defendant had the opportunity to confer with counsel or anyone else prior to the interrogation; whether the challenged statement was made during the course of an interrogation or instead was volunteered; whether any overt or implied threat or promise was directed to the defendant; the method and style employed by the interrogator questioning the defendant and the length

and place of the interrogation; and the defendant's mental and physical condition immediately prior to and during the interrogation, as well as educational background, employment status, and prior experience with law enforcement and the criminal justice system.

*Id.* at 1126.

[¶ 52] Mr. Hannon asserts the following factors made his statements involuntary: he did not feel free to leave and was not advised of his rights under *Miranda;* his statement was not volunteered but was made during an interrogation without the assistance of counsel; the physical setting of the interrogation was coercive; his physical and mental condition rendered his statement involuntary; and Deputy Mueller's method of questioning was coercive. It appears from his brief that Mr. Hannon relies most heavily on his mental condition and Deputy Mueller's method of questioning in claiming his statement was not voluntary. We consider his claim in accord with the standard requiring review of all of the circumstances, keeping in mind, however, that police overreaching is a critical element in any finding of involuntariness. *Colorado v. Connelly,* 479 U.S. 157, 163, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).

> While each police confession case has turned on its own set of factors justifying the conclusion that police conduct was oppressive, all have contained a substantial element of coercive police conduct. Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law.... [A]s interrogators have turned to more subtle forms of psychological persuasion, courts have found the mental condition of the defendant a more significant factor in the "voluntariness" calculus. But this fact does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional "voluntariness."

*Id.* at 164, 107 S.Ct. 515.

[¶ 53] Mr. Hannon asserts Deputy Mueller's method of questioning was coercive in that he: repeatedly told Mr. Hannon that he

knew what had happened with TB; ignored Mr. Hannon's denials and request for counsel; accused Mr. Hannon of lying; falsely told Mr. Hannon law enforcement found physical evidence placing him in TB's bed; essentially scripted Mr. Hannon's incriminating statements through the use of leading questions; encouraged Mr. Hannon's acquiescence to those questions by appearing to be understanding, sympathetic and reassuring; and spoon-fed TB's accusations to Mr. Hannon, initially using TB's mother as the focus, and then deceiving Mr. Hannon into agreeing that TB was the person upon whom he perpetrated the acts. Mr. Hannon claims these factors, when combined with his low IQ and suggestibility and the other circumstances of the interview, show that he was coerced into making involuntary statements, which the trial court should have suppressed.

[¶ 54] A finding of coercion or overreaching by law enforcement does not necessarily require evidence of violence, threats, overt intimidation or misconduct. Although we have said a confession is not voluntary if extracted by threats or improper influences or promises, we have also recognized that coercion can be mental as well as physical. *Garcia v. State,* 777 P.2d 603, 606 (Wyo. 1989). As one Wyoming jurist has noted:

> The role of the courts is to ensure that an individual's right to remain silent offers true protection to the individual. It is therefore dangerous for courts to end their inquiry into whether an individual's statements are truly voluntary once they have located the magic phrase "you do not have to answer any questions and you are free to leave." Coercion does not always come in such easy to spot packages as racks and whips. All too often it comes in the more subtle forms of an individual placed in jeopardy and told to make a crucial decision without the benefit of an attorney.

*Black,* 820 P.2d at 973 (Cardine, J., concurring). Thus, we have held particular tactics were not coercive when used by law enforcement on some suspects, but have found other tactics, used in combination with the particular personal characteristics of the accused, resulted in coercion. *Evans,* 944 P.2d at 1128. The inquiry is a fact-sensitive one, often resulting in cases that closely resemble each other being decided differently. *Id.*

[¶ 55] In *Black,* for example, we held that a confession was involuntary where it resulted from a two-hour interrogation of a woman who was seven months pregnant and was upset and crying during the interrogation. In *Vena v. State,* 941 P.2d 33, 38 (Wyo.1997), however, we upheld the trial court's finding that statements were voluntary where the accused was "a 53–year–old man, long experienced in working with law enforcement in the course of investigative work and not likely to be duped by a ruse so primitive as a fake promise that he would not be prosecuted" if he confessed. In *Solis,* 851 P.2d at 1300 (Wyo.1993), we again upheld the trial court's ruling that the defendant's waiver was not the product of deception and was made knowingly and intelligently despite evidence that he had difficulty understanding English. In contrast, in *Frias v. State,* 722 P.2d 135, 142 (Wyo.1986), we overturned a trial court ruling, noting among other factors that the defendant had only limited understanding of the English language and his rights under the American justice system.

[¶ 56] Of particular significance to the claim before us, we held in *Simmers v. State,* 943 P.2d 1189, 1196 (Wyo.1997), that the defendant's impaired mental ability when combined with the detective's non-adversarial, friendly interrogation style and promise of possible probation did not make the incriminating statements involuntary. Of interest in *Simmers,* we said:

> Simmers initially agreed to talk to the detective after being advised of his rights, including his right to an attorney, and made statements consistent with understanding those rights. Simmers came up with his own, fairly elaborate explanation for AJ's allegations. When questioning became more specific, Simmers claimed a lack of memory. When confronted with the specific allegations and an explanation from the detective that it was best for him to be honest and get things out in the open now, Simmers asked the detective to turn off the tape recorder.
>
> Simmers recalled asking all three victims to suck his penis and that none of

them liked it. He admitted telling the victims not to tell anyone what he had done to them. Simmers also acknowledged that it was his fault. At the end of the interview, Simmers stated that there were no other victims, that it would not happen again and that he needed to get some help. Although the record indicates Simmers was not experienced with law enforcement and was of below average intelligence, there is no evidence in the record tending to indicate that Simmers was unusually susceptible to coercion or easily influenced by the detective.

*Id.* As this excerpt demonstrates, Mr. Hannon's circumstances were similar in some respects—his low IQ and alleged inability to understand that he was free to leave or refuse to answer questions, and Deputy Mueller's non-adversarial style and promise that he would not charge Mr. Hannon that day—but distinguishable in others, including that Mr. Hannon did not come up with his own explanation for TB's allegations but acquiesced in Deputy Mueller's explanation, did not claim lack of memory or ask that the videotape be turned off, did not recall independently any specifics of any acts perpetrated upon TB but only upon TB's mother, and did not acknowledge that it was his fault or that he needed to get help. Even more importantly, unlike the defendant in *Simmers,* Mr. Hannon attempted to introduce evidence by way of an expert witness that he was unusually susceptible to coercion, particularly in the style used by Deputy Mueller, and easily influenced by authority figures.

[¶ 57] The circumstances surrounding Mr. Hannon's interview raise grave concerns. A strong argument can be made that under the totality of the circumstances Mr. Hannon did not understand that he was free to leave or refuse to answer Deputy Mueller's questions and was coerced into going along with the deputy's suggestions that TB rather than his mother was the object of Mr. Hannon's attentions such that his "will was overborne and his capacity for self-determination critically impaired." However, a majority of courts that have considered a defendant's statements under similar circumstances have held they were voluntary. *United States v. Makes Room For Them,* 49

F.3d 410 (8th Cir.1995); *United States v. Frank,* 956 F.2d 872 (9th Cir.1991); *United States v. Macklin,* 900 F.2d 948 (6th Cir.); *Moore v. Dugger,* 856 F.2d 129 (11th Cir. 1988); *Vance v. Bordenkircher,* 692 F.2d 978 (4th Cir.1982); *see generally,* Annot., *Mental Subnormality of Accused as Affecting Voluntariness or Admissibility of Confession,* 8 A.L.R.4th 16 (1981 & Supp.2002).

[¶ 58] In those cases where courts have held statements made by a defendant with low IQ were not voluntary, the circumstances generally were more egregious than those in Mr. Hannon's case. In *Fikes v. Alabama,* 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957), for example, the accused was a 27–year–old black man who started school at age eight and left school at age 16, still in the third grade. However, he was also schizophrenic and highly suggestible, interrogated for several hours each day for ten days, incarcerated during the period of interrogation, first in jail and then in a state prison far from home, kept in isolation for a week, and barred from the attempts of his father and a lawyer to see him. In *United States v. Zerbo,* 1999 U.S. Dist. LEXIS 15696, 1999 WL 804129 (D.C.S.D.N.Y.), the defendant was not only of below average intelligence but also was schizophrenic and particularly susceptible to coercion. During the interrogation, the officers isolated him from his family and care-taker and gave him the false impression they were there on his behalf rather than to investigate a crime. On the basis of these circumstances, the court held the statements were a product of an overborne will and should be suppressed.

[¶ 59] The circumstances of Mr. Hannon's interview make this a close case. However, in resolving the issue, we are called upon to balance two competing interests: first, society's interest in preserving the dignity of the individual and of society and preventing the risk of unreliable confessions by preventing the government from employing tactics that coerce confessions; and second, society's interest in allowing the government to use permissible tactics that may motivate a suspect to confess of his own free will. *Evans,* 944 P.2d at 1128. We are also

mindful of the standards applicable to our review—we do not disturb the trial court's findings unless they are clearly erroneous; the trial court is in the best position to assess the credibility of the witnesses and weight to be given the evidence; and we view the evidence in the light most favorable to the trial court's determination. *Id.* The trial court held a full evidentiary hearing on Mr. Hannon's motion to suppress the statements and had the opportunity to hear the witness' testimony and weigh their credibility. Viewing the evidence in the light most favorable to the trial court's ruling, we hold it did not abuse its discretion in denying the motion.[5]

### 3. Exclusion of expert testimony

[¶ 60] Prior to trial at a hearing on the state's various motions to exclude her testimony, Dr. Wells, Mr. Hannon's expert witness, testified based upon her psychological evaluation of Mr. Hannon that he had an overall IQ of 77, placing him in the sixth percentile, below 94% of the population in his age range and in the borderline to low average range. She also testified that his verbal IQ was 69, placing him in the extremely low range. Based upon her evaluation and watching the videotape interview of Mr. Hannon, Dr. Wells testified to the following observations:

> ... he seemed withdrawn, closed, certainly not confident, not a confident presence

with this police officer. He seemed to have a typical knee jerk reflective response of saying probably, which in my assessment, based upon my viewing the videotape, as well as my evaluation with him after I saw him, was consistent with his simplistic and personality functioning with his low verbal IQ and his lack of resources to bring to bear on a situation wherein authority figure is speaking with him.

His tendency, based upon the test data, is to get out of the situation as quickly as possible and to say whatever will appease the authority figure with whom he's interacting. His grossly deficient verbal skills also struck me as putting him at somewhat of a disadvantage. Based upon the IQ testing, Mr. Hannon appears to have a lack of good solid ability not only to take in what's being said to him verbally but to formulate that, to do anything with it cognitively and to make a response that would be a reasonable, rational response.

Again, his anxiety I think interferes and it seems to me avoid the situation so he says something very simple and something that is in the nature of acquiescence in order to relieve his anxiety and because he simply is verbally impaired.

At this point in the hearing, defense counsel asked Dr. Wells if she had an opinion about whether Mr. Hannon's responses during the

---

5. Although we affirm the trial court's ruling on the motion to suppress, our resolution of the other issues raised by Mr. Hannon results in a remand for a new trial. For purposes of the new trial, we offer the following comments. Wyoming follows the Massachusetts rule for determining whether a confession was voluntary, which initially requires the trial court to hear all the evidence concerning the confession in camera and make a determination as to whether it was voluntary. *Witt v. State,* 892 P.2d 132, 140 (Wyo.1995). If the trial court determines it was voluntary and denies the motion to suppress, the question of whether a confession is voluntary is then submitted to the jury. *Id.* The jury is instructed to disregard the confession if it finds it was involuntary. *Id.* Only after determining that the confession was voluntary may the jury consider it and determine the weight and credence it should be afforded. *Id.,* at 141.

In the present case, this procedure was properly followed—the trial court made the initial determination of voluntariness and then presented the issue to the jury for its determination. With respect to the latter determination, the jury properly was instructed that it could consider Mr. Hannon's statements only upon finding that he made the statements voluntarily, and that it must reject the statements if it concluded Mr. Hannon did not make them voluntarily. The jury was also properly instructed that upon finding the statements were voluntary, it must give them the weight and credibility it felt they deserved. The jury was not instructed, however, as to the factors it should consider in determining whether the statements were voluntary. A defense instruction to that effect was offered and refused by the trial court. On appeal, Mr. Hannon does not challenge the trial court's ruling with respect to the instruction and we, therefore, do not decide the issue. On remand, however, the jury should be instructed on the factors it should consider in deciding the voluntariness issue in accord with *Vena v. State,* 941 P.2d 33, 38 (Wyo. 1997). Without such an instruction, the jury has no way of knowing what voluntariness means in the context of a confession presented as evidence in a criminal trial.

interview were voluntary. The state asked to voir dire the witness and the following exchange occurred:

Q. You would agree, would you not, Dr. Wells, that there's no established or accepted methodology to determine the voluntariness of a confession in a criminal case?

A. Are you speaking of methodology for a psychologist?

Q. I'm talking about a generally accepted methodology relevant to the scientific community in your field.

A. When I evaluated Mr. Hannon, I followed the standardized methodology for conducting a psychological evaluation in a forensic setting with one of the questions being his personality characteristics and how they might bear upon a situation such as this where he's offering a confession, apparently.

Q. Now, Dr. Wells, I want to reask my question, ma'am. There is no accepted methodology to determine the voluntariness of a confession in a criminal case, is there?

A. For a psychologist—for any mental health professional it certainly is a challenge. It is a difficult task to determine this and there is no final determination, as you know. It is an opinion based—based upon a reasonable degree of professional certainty. Now, there are some methodologies which I did follow and they include the interview, the testing of documents, review of the videotape and asking certain questions about the actual interview during which the confession took place. So to that extent it's my opinion that it would be agreed upon in my professional community that this is a procedure to follow.

Q. But I'm not asking you about the procedure, Dr. Wells. I'm asking you about is there a specific * * * recognized methodology to determine the voluntariness of a confession in a criminal case? There is not, is there?

A. Well, sir, there is. I can cite some textbooks for you where it is discussed about how to go about this, and the procedure is essentially what I have followed. Now, is it the best procedure? No, it isn't. But it is what mental health professionals use.

* * *

Q. Regarding the attempts to evaluate the voluntariness of a confession in a criminal case, would you agree with the statement that clinical opinion will rarely be considered very probative on any of these issues and they're talking about considerations in voluntariness? Would you agree with that statement?

A. Well, I would have to know the context for the statement, and I'm familiar with that opinion and I would tend to agree with it if you're talking about how legal professionals would consider a psychological opinion about voluntariness of confessions; that is whether judges and lawyers would consider it very credible or very probative. I think in some cases psychological opinions about voluntariness of confession perhaps are not considered probative.

The questioning continued along these lines and then the following exchange occurred:

Q. Would you agree an evaluation of voluntariness is speculative?

A. I think if it is speculative then it is not based to a reasonable degree of professional certainty. I don't think the Court is interested in speculation.

Q. And in that regard, Dr. Wells, the specific method that you used in attempting to assess the voluntariness of a confession in a criminal case, that method cannot be tested, can it?

A. I'm not sure I understand. That method cannot be tested, I don't know what you mean by that.

* * *

Q. Okay. There's not a specific standardized test to determine the voluntariness of a confession. I understand

you've done some tests but there's not a specific test in that regard, is there?

A. Not as far as I'm aware, and even if there were it would be unethical and I think suggests lack of thoroughness if I would rely on one single test to form an opinion.

At this point, the state concluded its voir dire examination and renewed its objection "to any further testimony by Dr. Wells on the issue of voluntariness." The trial court sustained the objection, stating that it would not permit further testimony from Dr. Wells. Defense counsel asked to submit an offer of proof and elicited the following additional testimony from Dr. Wells:

* * * Making a clinical inference from the test data, which is what psychologists do, as well as my clinical impressions of Mr. Hannon during the clinical interview, I did form an opinion about his level of confidence when he interacts with other people in some sort of ... emotional encounter.

* * *

My opinion, based upon this information, is that Mr. Hannon is not a man with a great deal of self-confidence. He tends to keep to himself. He is shy and [aloof]. Feels very uncomfortable when he has to be among other people and when he's called upon to talk. He's self-conscious.

* * *

These personality characteristics don't go away. In fact, they are probably more accentuated in situations where Mr. Hannon is with a person who is more powerful than he and who has some authority over him. So Mr. Hannon at the time that he was speaking with the police officer was not able to call upon any more internal resources than he did. He's verbally limited. His vocabulary is very poor, and he does lack self-confidence so the tendency a person with these particular traits is to agree, to nod and to reflectively respond in an acquiescence way.

* * *

Based upon my observation, visual observation of the interview, as well as the test data and my interaction with Mr. Hannon in the interview that I did with him, it appears to me that it's reasonably certain or likely that he acted as he normally would, even in a more extreme way when he interacted with the police officer during the interview.

* * *

I determined based upon three sources; my viewing of the videotape, my interview with Mr. Hannon, and I saw how he interacted with me. He was much the same even with me, although I was brought there by his defense attorney. And I also had interpreted the test data and this is what the test data suggests about a person with these particular scores. So coupling that with my own interaction with him and viewing the other interaction with the authority figure, this is how I come to my opinion, and it's also based upon my expertise and my years of interviewing people.

Ultimately, Dr. Wells testified that in her opinion Mr. Hannon's statements were not voluntary. In addition to that quoted above, she testified that her conclusion was based upon her "years of clinical experience and evaluation work, much of which has been done in a criminal context and some of which has been done with other defendants who have a voluntary confession issue."

[¶ 61] At the conclusion of defense counsel's offer of proof, the trial court granted the state's motion to exclude Dr. Wells' testimony, stating:

The better weight of the authority of going into this was that expert testimony on voluntariness should not be permitted. I gave the defense substantial latitude in trying to show that there was at least some basis for the renewed reliability of voluntariness. It appears to me that based on this testimony that it confirms what the prior case holdings have done; that at best the testimony is speculative.

As I indicated, the testimony of this witness, combined with her report, really gives more of an inference of a diminished

capacity than going to the issue of voluntariness. Voluntariness, much as the great weight of authority suggests, is a matter for the jury. It appears to me that the expert testimony offered here, or at least the methodology does nothing more than what the jurors themselves will have to do in this instance, so that motion will be granted.

In response to the trial court's ruling, defense counsel objected and the following exchange occurred:

[Defense counsel]: Well, your honor, we do insist on the ability to call Dr. Wells for—to explain to the jury the things like IQ and results of tests, not necessarily on opinion on voluntariness to [confess].

The Court: * * * that goes exactly to my principal concern that I set forth twice already today, that goes to diminished capacity defense, which is not available in Wyoming.

[Defense counsel]: That could be addressed through a limiting instruction, Your Honor. We're not arguing diminished capacity. We have to be able to get his characteristics on the record that the jury will not be able to determine from the video.

Despite defense counsel's argument, the trial court prohibited Dr. Wells' testimony in its entirety.

[¶ 62] Mr. Hannon contends the trial court's ruling violated his constitutional right to a meaningful opportunity to present a complete defense. In the alternative, he claims the trial court abused its discretion in prohibiting Dr. Wells' testimony because it was admissible under W.R.E. 702.

[¶ 63] In *Crane v. Kentucky*, 476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986), the trial court denied the defendant's motion to suppress and then rejected any evidence concerning the circumstances of a confession, reasoning that once the confession was deemed voluntary at the suppression hearing, evidence as to voluntariness should not be presented to the jury. Reversing the trial court's ruling, the United States Supreme Court said:

The manner in which a statement was extracted is ... relevant to the purely legal question of its voluntariness, a question most, but not all, States assign to the trial judge alone to resolve. But the physical and psychological environment that yielded the confession can also be of substantial relevance to the ultimate factual issue of the defendant's guilt or innocence. Confessions, even those that have been found to be voluntary, are not conclusive of guilt. And, as with any other part of the prosecutor's case, a confession may be shown to be insufficiently corroborated or otherwise unworthy ... of belief. Indeed, *stripped of the power to describe to the jury the circumstances that prompted his confession, the defendant is effectively disabled from answering the one question every rational juror needs answered: If the defendant is innocent, why did he previously admit his guilt?* Accordingly, regardless of whether the defendant marshaled the same evidence earlier in support of an unsuccessful motion to suppress, and entirely independent of any question of voluntariness, *a defendant's case may stand or fall on his ability to convince the jury that the manner in which the confession was obtained casts doubt on its credibility.*

*Id.* at 688, 106 S.Ct. 2142 (emphasis added) (citations omitted). The Court stated further:

[W]e have little trouble concluding on the facts of this case that the blanket exclusion of the proffered testimony about the circumstances of petitioner's confession deprived him of a fair trial.

Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, *the Constitution guarantees criminal defendants a "meaningful opportunity to present a complete defense."* We break no new ground in observing that *an essential component of procedural fairness is an opportunity to be heard. That opportunity would be an empty one if the State were permitted to exclude competent, reliable evidence bearing on the credibility of a confession when such evidence is central*

*to the defendant's claim of innocence. In the absence of any valid state justification, exclusion of this kind of exculpatory evidence deprives a defendant of the basic right to have the prosecutor's case encounter and "survive the crucible of meaningful adversarial testing."*

*Id.* at 690, 106 S.Ct. 2142 (citations omitted). Under *Crane,* a defendant is deprived of his constitutional right to present a meaningful defense if competent and reliable evidence relating to the circumstances surrounding a confession is excluded where such evidence is central to the defendant's defense.

[¶ 64] There is no question that Dr. Wells' testimony related to the circumstances of Mr. Hannon's confession, e.g. his low intelligence, low verbal skills, and suggestability. There is also no question that evidence bearing on the credibility of the confession was central to Mr. Hannon's defense. The only question left unanswered is whether Dr. Wells' testimony was "competent and reliable" such that its exclusion deprived Mr. Hannon of his right to present a meaningful defense. In addressing this question, we must decide whether the evidence was admissible under W.R.E. 702.

[¶ 65] W.R.E. 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion.

[¶ 66] Ten years ago, in *Daubert,* 509 U.S. at 592–93, 113 S.Ct. 2786 the United States Supreme Court set forth an analysis to assist trial courts in determining whether expert testimony satisfies the requirements of Rule 702. We adopted that analysis in *Bunting,* 984 P.2d 467 as guidance for our courts in determining whether to admit or exclude expert testimony. Quoting *Kumho Tire Company, Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), in which the United States Supreme Court clarified *Daubert,* we said the primary goal of the *Daubert* analysis is to ensure the reliability and relevancy of expert testimony and make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the expert in the relevant field. *Bunting,* 984 P.2d at 471.

[¶ 67] Under the *Daubert* analysis, a two-part test applies to determine the admissibility of expert testimony. *Id.* The first prong of the test requires the trial court to determine whether the expert's methodology is reliable. *Id.* Among the factors guiding the trial court's assessment of reliability are: 1) whether the theory or technique in question can be and has been tested; 2) whether it has been subjected to peer review; 3) its known or potential rate of error along with the existence and maintenance of standards controlling the technique's operation; and 4) the degree of acceptance within the relevant scientific community. *Id.* The trial court may also consider the extensive experience and specialized expertise of the expert, whether the expert is proposing to testify about matters growing naturally and directly out of research they have conducted independent of litigation, and the non-judicial uses to which the method has been put. These factors do not necessarily or exclusively apply to all experts or every case. *Bunting,* 984 P.2d at 469, quoting *Kumho Tire.* Where they are reasonable measures of reliability, however, they should be considered. *Seivewright v. State,* 7 P.3d 24, 29 (Wyo.2000).

[¶ 68] If the trial court concludes the methodology is reliable under the first prong of the *Daubert* analysis, it then must determine whether the expert's proposed testimony fits the facts of the particular case—that is, is it relevant? *Bunting,* 984 P.2d at 472. Under this second part of the analysis, the expert's opinion must relate to an issue that is actually in dispute and must provide a valid scientific connection to the pertinent inquiry. *Id.*

[¶ 69] In applying the two-part *Daubert* analysis, the trial court need not and should not determine the scientific validity of the *conclusions* offered by an expert witness. *Id.* at 473. The trial court should only consider the soundness of the general scientific principles or reasoning upon which the ex-

pert relies and propriety of the methodology applying those principles to the specific facts of the case. *Id.* The ultimate question for the trial court is whether both sides will have a fair opportunity to test the validity of scientific results; if not, those results should not be admitted. *Id.*

[¶ 70] We turn to consideration of the case before us in light of these principles. The defense indicated Dr. Wells would testify concerning her evaluation of Mr. Hannon's susceptibility to police pressure and unique psychological condition. The record establishes that at the time she evaluated Mr. Hannon, Dr. Wells had been a practicing psychologist for fifteen years. In addition to being a licensed psychologist with a Ph.D in psychology, she had worked as a clinical and forensic psychologist since 1994 and as a psychotherapist since at least 1989. Besides her doctoral degree in psychology, Dr. Wells also had a JD and much of her work over the preceding years involved evaluating adults and juveniles charged with criminal offenses. She testified that since 1994, her practice had been devoted almost exclusively to conducting psychological evaluations in forensic study. As part of her pre—and post-doctoral training, she took courses in the administration, scoring and interpretation of psychological tests, including the Wechsler Adult Intelligence Scale 3, Rorschach Psychodiagnostic Inkblot Technique, Thematic Apperception Test and Millon Clinical Multiaxial Inventory 3. She estimated that as a licensed psychologist, she had administered 800 to 850 psychological evaluations that included these tests. Given these credentials, there is simply no question, and the state does not contest, that Dr. Wells had expertise in the field of psychology beyond that possessed by the average person. What we must decide, however, is whether the testimony she was prepared to present concerning Mr. Hannon was reliable and relevant to the matters at issue in his criminal trial.

[¶ 71] As set out above, the trial court's ruling that Dr. Wells' testimony would not be allowed was based on its conclusion that: 1) the better weight of authority is that testimony on voluntariness should not be allowed; 2) the defense failed to meet its burden of showing her testimony was reliable and instead confirmed that it was speculative; 3) her testimony raised an inference of diminished capacity, rather than that Mr. Hannon's statements were not voluntary, and Wyoming does not recognize a defense based upon diminished capacity; and 4) Dr. Wells' methodology involved no more than the jurors themselves could do. After a thorough review of the record and relevant legal authority, we hold the trial court abused its discretion in excluding Dr. Wells' testimony in its entirety.

[¶ 72] Numerous courts have addressed the question of whether expert psychological testimony is admissible in a criminal case to assist the jury in weighing the evidence relating to the circumstances giving rise to a defendant's incriminating statements for purposes of determining his guilt. Among the courts that have allowed the testimony, the reasoning has varied. In *United States v. Shay*, 57 F.3d 126, 133 (1st Cir.1995), the court held it was error for the trial court to exclude psychiatric testimony that the defendant suffered from a mental disorder that caused him to make false statements against his interests. The court reasoned the expert offered specialized testimony vital to the defense to assist the jury in understanding that the defendant was an exception to the commonly held belief that a person ordinarily does not make untruthful inculpatory statements.

[¶ 73] In *United States v. Hall*, 93 F.3d 1337, 1341 (7th Cir.1996), the court held the trial court erred in failing to conduct a full *Daubert* hearing before excluding the proposed expert testimony. The defense theory in *Hall* was that the defendant was susceptible to suggestion and pathologically eager to please and confessed to a crime he did not really commit in order to gain approval from his interrogators. The defense offered the testimony of two experts, a social psychologist, to testify about research showing some individuals can be coerced into giving false confessions and the indicia recognized as present when that is likely to occur, and a psychiatrist, who offered testimony about the defendant's mental condition and his opinion that the defendant could be easily led to give

responses he believed his questioner wanted and was susceptible to certain interrogation techniques and to confessing to a crime he did not commit. *Id.* The court stated:

> Because the fields of psychology and psychiatry deal with human behavior and mental disorders, it may be difficult at times to distinguish between testimony that reflects genuine expertise—a reliable body of genuine specialized knowledge— and something that is nothing more than fancy phrases for common sense. It is nevertheless true that disorders exist, and the very fact that a layperson will not always be aware of the disorder, its symptoms, or its consequences, means that expert testimony may be particularly important when the facts suggest a person is suffering from a psychological disorder.

*Id.* at 1343. While noting that each case turns on its own facts, the court held that the jury was entitled to hear relevant evidence on the issue of voluntariness, and to assess the truthfulness and accuracy of the confession and give it such weight as it felt it deserved. *Id.* at 1344.

> Even though the jury may have had beliefs about the subject, the question is whether those beliefs were correct. Properly conducted social science research often shows that commonly held beliefs are in error. [The expert's] testimony, assuming its scientific validity, would have let the jury know that a phenomenon known as false confession exists, how to recognize it, how to decide whether it fit the facts of the case being tried.

> The district court's conclusion [that the testimony offered nothing to what the jury would know from common experience] therefore missed the point. It was precisely because juries are unlikely to know that social scientists and psychologists have identified a personality disorder that will cause individuals to make false confessions that the testimony would have assisted the jury in making its decision. It would have been up to the jury, of course, to decide how much weight to attach to [the expert]'s theory, and to decide whether they believed his explanation of Hall's behavior or the more commonplace expla-

nation that the confession was true. But the jury here may have been deprived of critical information it should have had in evaluating Hall's case.

*Id.* at 1344–45.

[¶ 74] Like the courts in *Hall* and *Shay*, a number of other courts have held expert testimony admissible to assist the jury in weighing the circumstances giving rise to confessions. *United States v. Raposo*, 1998 U.S. Dist. LEXIS 19551 (expert psychological testimony admissible as helpful to jury in understanding that an individual with a certain psychological profile could be susceptible to confessing to a crime he did not commit); *Miller v. State*, 770 N.E.2d 763 (Ind.2002) (exclusion of expert testimony to assist jury in understanding psychology of interrogation of mentally retarded persons—topic outside common knowledge and experience—deprived defendant of opportunity to present defense); *State v. Buechler*, 253 Neb. 727, 572 N.W.2d 65 (1998) (exclusion of expert psychologist testimony would have assisted jury in determining defendant's credibility at trial and handicapped presentation of defense theory that confession was not worthy of belief); *State v. Vaughn*, 171 Conn. 454, 370 A.2d 1002 (1976) and cases cited therein (testimony of psychologist admissible to assist jury in considering weight and credibility to be accorded to confession); *People v. Hamilton*, 163 Mich.App. 661, 415 N.W.2d 653 (1987); *Carter v. State*, 697 So.2d 529 (Fla. Dist.Ct.App.1997).

[¶ 75] Other courts have upheld the exclusion of expert opinion concerning a criminal defendant's statements to law enforcement. In *United States v. Adams*, 271 F.3d 1236 (10th Cir.2001), the court upheld the exclusion of a psychologist's written report indicating that the defendant's mental make-up inclined him toward giving a false statement to the police. The court distinguished the case from *Hall* and *Shay*, stating:

> there simply is no question about the voluntariness of the confessions-and the defendant's recantation that he lied in order to protect his girlfriend is precisely the type of explanation that a jury is capable of resolving without expert testimony. The offered testimony does little more

than vouch for the credibility of another witness and thereby encroaches upon the jury's vital and exclusive function to make credibility determinations. The judge was well within his discretion in determining that the evidence lacked relevance and would not assist the trier of fact as required by Rule 702.

*Adams,* 271 F.3d at 1246.

[¶ 76] In *Kolb,* 930 P.2d at 1242, we, too, held inadmissible expert testimony from a psychologist concerning false confession syndrome. We said:

When asked about the scientific basis for "False Confession Syndrome," the psychologist testified it is not a syndrome, but is better understood as a collection of reasons why people may give false confessions. A syndrome, he testified, is a cluster of symptoms which indicate an underlying cause, which in this case would be a psychopathology. The psychologist further testified he had no training regarding "False Confession Syndrome"; "False Confession Syndrome" is not a diagnostic term in psychology; there were no psychological studies supporting "False Confession Syndrome" upon which he could base his testimony; and a retracted confession does not necessarily indicate the confession was false.

We discussed *Sorensen v. State,* 895 P.2d 454 (Wyo.1995), in which we held that "traumagenic dynamics" was not developed sufficiently to allow an expert to offer a reasonable opinion based on the theory and concluded on the basis of the evidence presented that false confession syndrome likewise was insufficiently supported by scientific study. *Kolb,* 930 P.2d at 1242. Noting that at best the expert had watched one television program referring to "false confession syndrome," we concluded the trial court did not abuse its discretion by prohibiting the testimony.

[¶ 77] Along similar lines, the Minnesota Supreme Court held in *Bixler v. State,* 582 N.W.2d 252 (Minn.1998), that the trial court properly excluded psychological testimony to the effect that the defendant was susceptible to coercion because of his low intelligence. Characterizing the testimony as "nothing more than a composite of personal characteristics that might render an individual more susceptible to wanting to please an authority figure," the court concluded the testimony did not have sufficient scientific specificity to warrant reversing the trial court's exercise of its discretion. *Id.* at 256. It held "the trial court was well within its discretion in ruling that the jury, without the testimony of the psychological expert, was fully capable of observing and understanding [the defendant]'s propensity to please authority figures, and taking those observations and that understanding into account in evaluating his confession." *Id.*

[¶ 78] Having reviewed these cases, the testimony of Dr. Wells, and the particular circumstances of Mr. Hannon's case, we are persuaded the cases in which expert testimony was excluded should not control the result here. We are unable to determine from the court's opinion in *Adams* what particular facts persuaded the court the testimony was properly excluded. Unlike the situation in *Bixler,* the jury in this case had no way of observing and understanding Mr. Hannon's psychological limitations without Dr. Wells' testimony. Dr. Wells was the only witness qualified to testify concerning Mr. Hannon's low IQ and its probable effect on his behavior during the interview. While the jury had the opportunity to view the videotape of the interview, it had no way of knowing that Mr. Hannon's overall IQ placed him below 94% of the population in his age range and that his verbal IQ placed him even lower. From reviewing the videotape, the jury also had no way of knowing that his verbal skills were grossly deficient, making it difficult for him to take in what was being said to him, to understand it cognitively and to respond in a reasonable, rational way. Without the testimony of Dr. Wells, the jury had no way of knowing that psychological testing revealed that because of his low cognitive functioning and lack of verbal skills, Mr. Hannon's tendency was to respond to questioning, particularly by those in positions of authority, by saying whatever might be necessary in order to get out of the situation as quickly as possible.

[¶ 79] This sort of testimony was central to Mr. Hannon's defense. As in *Crane*, 476 U.S. at 688, 106 S.Ct. 2142 Mr. Hannon's case stood or fell on his ability to convince the jury that his statements to Deputy Mueller were not true. Stripped of the opportunity to describe to the jury the conditions that caused him to confess, Mr. Hannon was effectively disabled from explaining why, if he was innocent, he went along with Deputy Mueller's description of what happened with TB. Like the United States Supreme Court in *Crane*, we have little trouble concluding on the facts of this case that the blanket exclusion of Dr. Wells' testimony about the factors influencing Mr. Hannon's confession deprived him of a fair trial.

[¶ 80] As with *Bixler*, we likewise find *Kolb* to be distinguishable from the present case. In *Kolb*, the expert's proposed testimony related generally to a "syndrome" about which he had conducted no studies and had no training and had formed opinions by watching one television program. Additionally, there is no indication in *Kolb* that the expert evaluated or interviewed the defendant or listened to the tape-recorded confession. In contrast, Dr. Wells performed a psychological evaluation of Mr. Hannon based upon a clinical interview, a battery of psychological tests and a review of the videotape interview. Based upon that evaluation, she offered testimony pertaining specifically to Mr. Hannon's individual psychological and cognitive functioning relevant to the jury's determination of whether the interview was voluntary. Rather than offering general testimony about a "syndrome" like the expert in *Kolb*, Dr. Wells offered specific testimony about Mr. Hannon and how she perceived his low IQ and lack of verbal skills affected his behavior during the interview. The basis for her opinions was her psychological evaluation of Mr. Hannon, one of hundreds of such evaluations she performed over the preceding fifteen years, and not merely broad conclusions reached on the basis of watching a television program as was the case in *Kolb*.

[¶ 81] As was said in *Crane*, the constitution guarantees criminal defendants a meaningful opportunity to present a complete defense. An essential component of procedural fairness is an opportunity to be heard. That opportunity is denied where competent reliable evidence bearing on the voluntariness of a confession is excluded; particularly where the defendant's only avenue of defense is to show the confession is false. Unless the evidence is flatly unreliable, its exclusion deprives a defendant of presenting a defense.

[¶ 82] In a long series of cases, we have allowed expert testimony in criminal cases to explain victims' behavior. *Williams v. State*, 2002 WY 184, 60 P.3d 151 (Wyo.2002); *Chapman v. State*, 2001 WY 25, 18 P.3d 1164 (Wyo.2001); *Seivewright*, 7 P.3d 24; *Frenzel v. State*, 849 P.2d 741 (Wyo.1993); *Scadden v. State*, 732 P.2d 1036 (1987); *Griego v. State*, 761 P.2d 973 (1988). Generally, we have done so because such testimony was useful in disabusing juries of widely held misconceptions about the behavior of victims of particular crimes so they could evaluate the evidence free of the constraints of popular myths. *Scadden*, 732 P.2d at 1047. We found such testimony relevant and helpful in explaining to the jury the typical behavior patterns of victims of certain crimes and helping jurors understand why a particular victim behaved as he or she did. *Griego*, 761 P.2d at 978; *Chapman*, ¶ 18. Even where we concluded a particular syndrome had not reached the stage of development permitting unlimited expert testimony on the subject, we held a psychologist could testify concerning behaviors typical of victims and then relate them to the particular victim based upon individualized psychological testing and evaluation. *Frenzel*, 849 P.2d at 746. Under the particular facts of Mr. Hannon's case, we find this same reasoning persuasive in the context of Dr. Wells' testimony. That is, we find that her testimony would have been helpful in explaining to the jury how Mr. Hannon's particular psychological traits and cognitive abilities may have influenced his behavior during the interview.

[¶ 83] In addition to its conclusion that the better weight of authority excluded Dr. Wells' testimony, the trial court found her testimony was unreliable. In reaching this conclusion, the trial court did not specify which of the *Daubert* factors, if any, it was relying on but simply concluded the defense

did not meet its burden of showing the testimony was reliable. We have said that when a trial court disposes of a case by precluding expert testimony, its decision must be supported by more than a single conclusory statement applying one nondispositive *Daubert* factor. *Williams*, ¶ 18. Although here the trial court did not dispose of the state's case by precluding Dr. Wells' testimony, we believe the above reasoning applies. The trial court's decision to exclude in its entirety expert testimony constituting the only evidence supporting a criminal defendant's theory of the case must be supported by more than a conclusory statement that the testimony is unreliable. Such a decision must articulate the factors considered by the trial court and how those factors support its decision. *Bunting*, 984 P.2d at 475.

> "To play fair, a trial judge relying on discretionary power should place on record the circumstances and factors that were crucial to his determination. He should spell out his reasons as well as he can so that counsel and the reviewing court will know and be in a position to evaluate the soundness of his decision."

*Id.*

[¶ 84] Although we are unable to determine which of the *Daubert* factors, if any, led the trial court to conclude Dr. Wells' testimony was unreliable and ought to be excluded in its entirety, what does appear from the ruling is that the trial court was focused on the issues of voluntariness and diminished capacity. Neither of these issues supported the exclusion of Dr. Wells' testimony.

[¶ 85] It is clear from the record the defense was not attempting to raise a diminished capacity defense through Dr. Wells' testimony and her testimony was not properly excluded on that basis. It also is clear that despite the conflicting approaches courts have taken on the admissibility of expert testimony on false confessions, Dr. Wells' testimony concerning the testing she performed, her evaluation and her opinions based upon the evaluation and testing clearly was admissible. Although not without controversy, the use of psychological and social science research in law is now commonplace. Paul C. Giannelli and Edward J. Imwinkel-

ried, *Scientific Evidence*, p. 427 (3rd Ed.1999). It has been described as "social frameworks," meaning the use of social science research to provide a context for assisting a jury to decide a specific factual issue. *Id.* at 428. Expert psychological testimony has been admitted in a variety of contexts to assist the jury in deciding a variety of issues, including issues relating to eyewitness identification, battered woman syndrome, rape trauma syndrome, child sexual abuse syndrome, profile evidence, false confessions, the defense of entrapment and the defense of duress. *Id.* at 427–491. Expert testimony in these areas is often considered helpful because experts can systematize and explain such conditions better than laypeople. Mueller and Kirkpatrick, Federal Evidence § 362, p. 717 (2nd Ed.1994).

[¶ 86] Where, as here, there is no contention that the expert was unqualified, and the testimony was based upon opinions derived from performing a psychological evaluation of the defendant using standard procedures and tests generally accepted in the field of psychology as well as the expert's many years of experience performing similar testing and evaluations of other individuals similarly situated, we hold that the expert testimony was improperly excluded under Rule 702. Mr. Hannon was entitled to have Dr. Wells testify about the tests she performed, the interviews she conducted, and her assessment of Mr. Hannon from a psychological perspective based on the tests and interviews. She also should have been permitted to testify as to her opinions about how Mr. Hannon's psychological traits and cognitive functioning could have affected his behavior during the police interview, including any opinion she may have formed as to his capacity to understand the situation sufficiently to make a free and determined choice to admit the allegations presented to him by Deputy Mueller.

[¶ 87] Wyoming Rule of Evidence 704 provides: "Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." The fact, therefore, that the issue of voluntariness was for the jury to decide does not

make Dr. Wells' expert opinion that Mr. Hannon did not have the mental capacity to give a voluntary confession inadmissible. Under Rule 704, Mr. Hannon was entitled to present her testimony in that regard. Addressing any concern that allowing such testimony would usurp the function or invade the province of the jury, we agree with that said by Mueller and Kirkpatrick: "the jury can reject testimony that speaks directly to ultimate issues, and there is no reason to think that testimony of this sort is especially likely to overwhelm a jury or persuade it to give up its independence." Federal Evidence, at 702. Concerns that a jury "would give up its responsibility to look critically at testimony and just take the word of the witness" are overstated "since juries have the power and authority to reject even decisive and informed testimony, and are told as much before they retire to deliberate." *Id.* at 704. Moreover, where valid concern exists that a jury may be overwhelmed by expert testimony, which we find unlikely under the circumstances of Mr. Hannon's case, WRE 702 and 403 adequately serve such concern. *Id.* at 703.

[¶ 88] We hold that Mr. Hannon was entitled to present expert opinion testimony concerning his mental capacity to voluntarily admit the allegations presented by Deputy Mueller. Our holding in this regard, however, is limited strictly to its terms and is not to be read to mean that opinion testimony, expert or otherwise, that vouches for the credibility of a witness is admissible. We have held consistently that the admission of opinion testimony as to a defendant's guilt, a defendant's state of mind at the time of the offense, or the *credibility of a witness* was improper under Rule 704. *Witt,* 892 P.2d at 138; *Bennett v. State,* 794 P.2d 879 (Wyo.1990); *Stephens v. State,* 774 P.2d 60 (Wyo.1989). We deem jurors to be experts in determining the credibility of witnesses and for that reason assign to the jury the task of determining who is credible and who is not. *Ogden v. State,* 34 P.3d 271, 276 (Wyo.2001). We have found reversible error where testimony was admitted that primarily, or at least substantially, vouched for a victim's credibility. *Wilde v. State,* 2003 WY 93, 74 P.3d 699. Under this line of cases,

therefore, Mr. Hannon was not entitled to present testimony from Dr. Wells concerning any opinions she may have formed about whether he was telling the truth when he admitted the allegations during the interview. Rather, we reiterate that Mr. Hannon was entitled to present Dr. Wells' testimony concerning opinions she may have formed concerning whether Mr. Hannon had the capacity to make a free and determined choice to admit the allegations during the interview. Upon presentation of this testimony, the state, of course, was entitled to vigorously cross-examine Dr. Wells, present contrary evidence, including a qualified expert, and have the jury properly instructed on the burden of proof, its duty to determine whether the statements were voluntary and the factors to be considered in making that determination. Then it was the jury's function to determine whether the statements were voluntary and, if so, whether they were credible and how much weight they should be afforded. *Vena,* 941 P.2d at 38; *Witt,* 892 P.2d at 140. We hold the trial court abused its discretion in excluding the testimony of Dr. Wells.

[¶ 89] The case is reversed and remanded for a new trial.