2012 WY 70

**Christopher Ray COUNTS, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

**No. S–11–0160.**

Supreme Court of Wyoming.

May 22, 2012.

Representing Appellant: Diane M. Lozano, State Public Defender; Tina N. Olson, Appellate Counsel; Eric M. Alden, Senior Assistant Appellate Counsel. Argument by Mr. Alden.

Representing Appellee: Gregory A. Phillips, Attorney General; David L. Delicath, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Meri Geringer, Senior Assistant Attorney General. Argument by Ms. Geringer.

Before KITE, C.J., and GOLDEN, HILL, VOIGT, and BURKE, JJ.

BURKE, Justice.

[¶ 1]   Christopher Ray Counts was convicted of aggravated burglary and kidnapping. He raises several issues on appeal, but we find no reversible errors in the district court proceedings. We affirm.

### ISSUES

[¶ 2]   Mr. Counts presents these issues:

1.  Did the court abuse its discretion by refusing to admit complete documents and recordings and by admitting altered documents?

2.  Did the court abuse its discretion by denying Mr. Counts the right to cross-examine and impeach the witness against him in violation of his constitutional rights?

3.  Did the court abuse its discretion in denying the motion for a bill of particulars?

4.  Did the court improperly instruct the jury?

5.  Was the verdict inconsistent?

6.  Was there sufficient evidence to support the verdict?

### FACTS

[¶ 3]   Mr. Counts' girlfriend, BP, lived with her children and parents in the parents' home. BP's bedroom was on the lower level of the house. On the evening of July 15, 2010, Jared Gilstrap and Dustin Thomas were planning to go to the county fair with BP. She had known Mr. Gilstrap since high school, and Mr. Thomas was his cousin. BP was not ready when they arrived, so they went into the house to wait. A few minutes later, they heard Mr. Counts begin pounding on one of the windows, calling loudly for BP to let him in to get his cell phone charger. When BP did not respond, Mr. Counts walked around the house, shouting and pounding on windows and the back door. His activities were loud enough to draw the attention of neighbors inside their own homes. One neighbor testified that Mr. Counts sounded "Angry. Very angry." Three of BP's neighbors called the police.

[¶ 4] Mr. Gilstrap and Mr. Thomas testified that BP "freaked out" and became "frantically scared." She shut off the lights in the house, and positioned herself where she could escape out the back door if Mr. Counts came in the front, or out the front door if he came in the back. BP, Mr. Gilstrap, and Mr. Thomas soon heard a crash at the back door and the sound of breaking glass and wood. As Mr. Counts entered the back door, BP ran out the front. Mr. Gilstrap and Mr. Thomas testified that Mr. Counts was carrying a knife, and that as he passed them, he said, "I warned you once, bitch."

[¶ 5] BP went out the front door and ran toward a neighbor's house, then tried to hide under a parked pickup. Mr. Counts ran after her, grabbed her by the hair and neck, and dragged her back toward her house. BP was "screaming" and "begging" for help. When Mr. Counts got BP back to her house, he told Mr. Gilstrap and Mr. Thomas to go, and slammed the front door as they exited. They heard thuds and loud screams in the house behind them.

[¶ 6] According to BP, Mr. Counts then forced her downstairs into her room, where he threw her on the bed and choked her while cursing and calling her names. He closed and locked the door to the room, and stood in front of it to prevent her from leaving. Mr. Counts hit her, choked her, and threw objects at her. After about an hour, Mr. Counts calmed down, and BP told him she would take the blame for the broken back door. Mr. Counts tied an electric cable around BP's waist to keep her from escaping, and the two went upstairs to see if the door could be fixed. They decided it could not, and returned to her room.

[¶ 7] The police had arrived by this time, and several officers surrounded the house. An officer called BP on the telephone, asking her and Mr. Counts to come out of the house. Mr. Counts refused. When the officer called a second time, BP handed the telephone to Mr. Counts. The officer told him that the house was surrounded, and eventually Mr. Counts agreed to come outside with BP. As the two went outside, they were met by law enforcement personnel, who took them both into custody.

[¶ 8] The officers found a knife in Mr. Counts' pocket. They investigated inside the house, and found a folding pocket knife under the mattress in BP's bedroom downstairs. They took statements from Mr. Gilstrap and Mr. Thomas. They also took a statement from BP. In later statements, however, BP either recanted her initial statement in certain respects or added significant information that she had not told the police that night. For example, in separate statements to the prosecutor's office and to the public defender's office, she stated that she, not Mr. Counts, had broken the door. She added that Mr. Gilstrap and Mr. Thomas were taking drugs that night and offered her some as well. She also stated that Mr. Counts did not have a knife that night.

[¶ 9] In August, the prosecution learned that Mr. Counts had been communicating with BP. He had been ordered not to contact her, but he used intermediaries or asked her to use a pseudonym. In one letter, for example, he told his cousin to tell BP that

> if she doesn't want me to do life she needs to admit to kicking the door open herself earlier that day and she was afraid to tell the truth because she doesn't want her parents to find out because she is afraid of losing her children and her place to live and her stepdad is violent to her.

Mr. Counts also advised BP to admit to getting high with Mr. Gilstrap and Mr. Thomas, and asked her to convince Mr. Gilstrap to deny that Mr. Counts had a knife. In another letter, he asked BP to write a letter to the newspaper saying she had lied about what happened, and specifically saying that she had broken the back door and that Mr. Counts had no knife.

[¶ 10] Mr. Counts was charged with three felonies: aggravated assault and battery in violation of Wyo. Stat. Ann. § 6–2–502(a)(iii) (LexisNexis 2009); aggravated burglary in violation of Wyo. Stat. Ann. § 6–3–301(c)(i); and kidnapping in violation of Wyo. Stat. Ann. § 6–2–201(a)(iii). Based on prior felony convictions, Mr. Counts was also charged as an habitual criminal subject to mandatory life imprisonment under Wyo. Stat. Ann. § 6–10–201(b)(ii). The jury returned a verdict find-

ing Mr. Counts not guilty of the aggravated assault and battery charge, but guilty on the charges of aggravated burglary and kidnapping. During a subsequent phase of the trial, the jury also found Mr. Counts guilty under the habitual criminal statute. The district court ordered him to serve two concurrent life sentences. Mr. Counts filed this appeal.

## DISCUSSION

### Issue 1: Redacted documents and recordings

[¶ 11] Despite a no-contact order, Mr. Counts used intermediaries or pseudonyms to send letters to BP while he was incarcerated prior to trial. These letters included observations about her prior statements, and requests or advice about what she should say in the future. Prior to trial, the prosecution informed the district court that it intended to offer excerpts of the letters into evidence. Mr. Counts objected, claiming that the evidence was inadmissible. If the letters were admitted, however, Mr. Counts contended that they should be admitted in their entirety. The district court ruled that excerpts of the letters could be admitted into evidence, with certain inadmissible information redacted. On appeal, Mr. Counts continues to maintain that the letters should have been admitted or excluded in their entirety, and that the district court erred in admitting only excerpts.

[¶ 12] "Rulings on the admission of evidence are placed within the sound discretion of the trial court and, in order to challenge these rulings successfully on appeal, an appellant must show that the trial court committed a clear abuse of discretion." *Glenn v. Union Pacific R.R. Co.*, 2011 WY 126, ¶ 12, 262 P.3d 177, 182 (Wyo.2011). "A trial court's rulings on the admissibility of evidence are entitled to considerable deference, and, as long as there exists a legitimate basis for the trial court's ruling, that ruling will not be disturbed on appeal." *Sanchez v. State*, 2006 WY 116, ¶ 20, 142 P.3d 1134, 1140 (Wyo.2006). "Even when a trial court errs in an evidentiary ruling, we reverse only if the error was prejudicial. The appellant must show a reasonable probability that, without the error, the verdict might have been different." *Schmid v. Schmid*, 2007 WY 148, ¶ 10, 166 P.3d 1285, 1288 (Wyo.2007).

[¶ 13] Mr. Counts' position is that the complete letters should have been admitted, without redaction, and that the district court erred in allowing only excerpts of the letters into evidence. In support of his contention, Mr. Counts relies upon W.R.E. 106:

When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him at that time to introduce any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

Mr. Counts claims that the district court's redactions violated this rule because "[m]ore than half of the content of the letters [was] deleted" and "large parts of the letters were hidden from the jury."

[¶ 14] We have referred to W.R.E. 106 as the "rule of completeness." *Lopez v. State*, 2004 WY 103, ¶ 63, 98 P.3d 143, 158 (Wyo. 2004). We have applied it, but without detailed analysis. *See, e.g., Hayes v. State*, 935 P.2d 700, 706 (Wyo.1997) (prosecution allowed to "present a more complete and accurate picture of the police report" after the defense "presented a partial and selective picture of what was in the report"). Both Mr. Counts and the State refer us to a decision from the United States Court of Appeals for the Tenth Circuit explaining the nearly identical federal rule:

The purpose of Rule 106 is to prevent a party from misleading the jury by allowing into the record relevant portions of a writing or recorded statement which clarify or explain the part already received. The rule of completeness functions as a defensive shield against potentially misleading evidence proffered by an opposing party. The rule of completeness, however, does not necessarily require admission of an entire statement, writing or recording. Rather, only those portions which are relevant to an issue in the case and necessary to clarify or explain the portion already received need to be admitted. In determining whether a disputed portion of a

statement must be admitted under the rule of completeness, the trial court should consider whether (1) it explains the admitted evidence, (2) places the admitted evidence in context, (3) avoids misleading the jury, and (4) insures fair and impartial understanding of the evidence.

*United States v. Lopez–Medina*, 596 F.3d 716, 735 (10th Cir.2010) (internal citations and punctuation omitted). We find the Tenth Circuit's analytical framework to be useful, and will apply it to Mr. Counts' case.

[¶ 15] As noted above, the prosecution informed the district court of its intent to offer excerpts of the letters, and Mr. Counts objected. After considering the parties' positions, the district court ruled that excerpts of the letters could be admitted into evidence, with certain inadmissible information redacted. Prior to trial, the district court held a hearing in which it reviewed in detail the excerpted letters the prosecution intended to offer. It considered the objections offered by Mr. Counts, and additional portions of the letters Mr. Counts asked to be included.[1] After going through the letters paragraph by paragraph, the district court agreed in many instances to include the additional material suggested by Mr. Counts. However, it ruled that three types of information from the letters were inadmissible and would be redacted: (1) references to the fact that Mr. Counts could be sentenced to life in prison; (2) parts of the letters that the district court found to be "self-serving" and "vouching;" and (3) the fact that some of BP's statements were made directly to the District Attorney and the Public Defender, the attorneys involved in the case. Mr. Counts argues on appeal that it was error to exclude these three types of information, and we will consider each type in turn.

[¶ 16] To illustrate the district court's exclusion of information about the potential life sentence and the self-serving and vouching information, the following is a portion of one of the letters Mr. Counts wrote. The stricken-through text is that redacted by the district court before admitting the letter into evidence:

~~Don't text any of this to her, but tell her that if she doesn't want me to do life~~ she needs to admit to kicking the door open herself earlier in the day and she was afraid to tell the truth because she doesn't want her parents to find out because she is afraid of losing her children her place to live and her stepdad is violent to her. She also needs to admit to getting high with Jared and Dusty that night, she cannot get into trouble ~~for this. I talked with my lawyer and there is no possession by consumption law in Wyo. unless on probation or parole. Again that she doesn't want for her parents to find out.~~

~~She has already told my lawyer the truth about me not having a knife, and she admitted the $$ was mine, and she told my lawyer straight up that I did not kidnap her.~~

[¶ 17] The district court redacted the text in the first paragraph ("~~Don't text any of this to her, but tell her that if she doesn't want me to do life~~") because it referred to Mr. Counts' potential life sentence. Mr. Counts concedes that sentencing is the sole prerogative of the court, and the potential sentence is generally irrelevant to the jury's consideration of the facts. In his particular case, however, he asserts that this information was necessary to help explain why he wrote the letters.

[¶ 18] To understand this argument, it is important to consider the basis on which all of the letters were admitted into evidence. The prosecution asserted that Mr. Counts' letters reflected efforts to convince BP to fabricate false testimony, and were evidence of Mr. Counts' "consciousness of guilt." "We have followed the principle that evidence of an attempt to fabricate evidence is particularly harmful to a defendant since it is an incriminating circumstance inconsistent with innocence and tends to show consciousness of guilt." *Miller v. State*, 830 P.2d 419, 427

---

1. We note that these hand-written letters are very difficult to decipher in some places. The prosecutor, defense counsel, and the district court put substantial efforts into interpreting the letters, identifying the portions each side wanted to be accepted or excluded as evidence, and preparing excerpted versions of the letters to use as evidence. We commend their thorough efforts to resolve a difficult evidentiary problem.

(Wyo.1992); *see also Garza v. State,* 2010 WY 64, ¶ 8, 231 P.3d 884, 887 (Wyo.2010). Mr. Counts countered that he was not trying to get BP to make up false evidence, but instead, that he was encouraging her to tell the truth. Thus, he contended, the letters "were not the result of a consciousness of guilt but rather of a consciousness of the monstrous penalties inevitable upon a mistaken finding of guilt." The jury needed to consider the evidence that he knew he was facing a life sentence, Mr. Counts asserts, in order to evaluate whether the letters reflected his consciousness of guilt or his fear of unjustified punishment. For that reason, he contends, information regarding his potential life sentence was relevant and should have been admitted. In terms of the Tenth Circuit's analytical framework, Mr. Counts contends that this information was necessary to explain the admitted evidence and place it in context. *Lopez–Medina,* 596 F.3d at 735.

[¶ 19] In addition to the fact that evidence about potential penalties is generally inadmissible, the district court articulated two reasons for excluding references to life imprisonment. First, presenting evidence of the severe punishment faced by Mr. Counts could lead the jury to base its decision on improper grounds. As the district court observed, that could work against Mr. Counts if the jury felt antipathy for him, or in his favor if they felt sympathetic. Second, Mr. Counts faced a potential life sentence only because he was charged as an habitual criminal with prior felony convictions. The statutes explicitly provide that the jury must consider the current charges first, and then consider the previous convictions only if the defendant is convicted of the underlying charges. Wyo. Stat. Ann. § 6–10–203. The fact that bifurcated proceedings are required by statute in an habitual criminal case further indicates that the jury should not be informed that Mr. Counts faced a potential life sentence as they considered the current charges against him during the first phase of the trial. We believe that these considerations provide a reasonable and legitimate basis for the district court's ruling.

[¶ 20] Moreover, Mr. Counts has not shown how the jury could have been misled by the redaction of references to a potential life sentence. In his testimony, Mr. Counts had the opportunity to offer his explanation of the reason he wrote the letters: "Because I'm scared to death for my—I'm scared the amount of time that I could get and I just want people to tell the truth." Based on this evidence, defense counsel argued to the jury that Mr. Counts made the statements out of fear of unjust punishment, as he now argues on appeal. It was unnecessary to specify precisely what that punishment might be, and accordingly, specific references to potential life sentences were unnecessary to explain the letters or place them in context. Because the information could have improperly influenced the jury, and because the references to a life sentence were unnecessary to explain the letters, we cannot say that the district court's decision to redact this information was unreasonable under the circumstances.

[¶ 21] The district court redacted the information in the third paragraph ("~~She has already told my lawyer the truth about me not having a knife, and she admitted the $$ was mine and she told my lawyer straight up that I did not kidnap her.~~") on the basis that it was "self-serving" and "vouching." Mr. Counts asserts that testimony is often self-serving, and indeed, it may be offered by a defendant for precisely that reason. "That his testimony is self-serving is obvious, but it does not necessarily mean that it should be rejected. Rather, it should be weighed with the other evidence." *Wilkins v. State,* 2005 WY 2, ¶ 10, 104 P.3d 85, 90 (Wyo.2005). Mr. Counts contends that it was improper for the district court to exclude testimony just because it was self-serving. As to vouching, Mr. Counts concedes that, as a general rule, it is improper to vouch for the credibility of another witness through argument or testimony. *Foster v. State,* 2010 WY 8, ¶ 28, 224 P.3d 1, 13 (Wyo.2010). His position is, however, that the redacted portions of the letter did not constitute improper vouching.

[¶ 22] Mr. Counts asserts that only certain types of vouching evidence are inadmissible: a prosecutor may not vouch for the veracity of a witness, *Guy v. State,* 2008 WY 56, ¶ 20, 184 P.3d 687, 694 (Wyo.2008); a

witness may not give opinions about the truthfulness of other witnesses, *Drury v. State*, 2008 WY 130, ¶ 10, 194 P.3d 1017, 1020 (Wyo.2008); and expert witnesses may not give opinions about the credibility of other witnesses. *Large v. State*, 2008 WY 22, ¶ 18, 177 P.3d 807, 813 (Wyo.2008). Mr. Counts claims that the language redacted from his letter is a different type of vouching. It was not vouching by a prosecutor or an expert. He also contends that it was not meant to bolster the credibility of BP, but only to indicate that Mr. Counts agreed with certain statements made by her. As Mr. Counts argues in his brief, "If two witnesses saw the same car wreck and the second witness to testify stated that what the first witness had said was true, that would not be improper vouching. That would be agreement."

[¶ 23] Mr. Counts' argument may be correct, but again, he has failed to demonstrate how he was prejudiced by the district court's decision to redact this language. The redacted language did no more than repeat other evidence heard by the jury during trial. BP testified to her previous statements that Mr. Counts did not have a knife, that the money belonged to Mr. Counts, and that Mr. Counts did not kidnap her. Mr. Counts also testified, in substance, that he had no knife, that the money was his, and that he did not kidnap BP. The redacted language did no more than reiterate that Mr. Counts agreed with BP's prior statements. Because the redacted information was merely cumulative, the district court did not abuse its discretion in redacting it from the letter.

[¶ 24] Mr. Counts' third objection is that the district court redacted that BP had made some of her statements directly to the District Attorney and some directly to the Public Defender. The district court was concerned that allowing this information into evidence might force the attorneys involved in the case to testify as witnesses to these statements. To avoid that potential problem, the district court substituted language indicating that statements made to the prosecutor had been made to "law enforcement," and statements made to the public defender had been made to "my investigator." To illustrate, the following is an excerpt from a

letter admitted into evidence. References to the prosecutor and the public defender, those deleted by the district court, are stricken through, and the substituted language appears within brackets:

> Just ask her, do not threaten her or anything ok, promise me. Ask her to write a letter, in that letter she needs to admit to lying about me taking her $, she needs to admit it was mine, she needs to admit to how the back door was opened, or at least I didn't kick it open, everything she has told ~~my lawyer~~ [my investigator] and ~~the D.A.~~ [law enforcement].

> Nothing that hurts me, keep it vague except to the points, I didn't have a knife, I didn't threaten the two guys, I didn't kidnap her, I didn't hold her against her will, I never told her she couldn't leave, she walked on her own in front of me into her house. I asked the guys to leave, I never threatened her. She needs to make clear all of the points she has already made clear to ~~my lawyer~~ [my investigator] and ~~the D.A.~~ [law enforcement].

[¶ 25] Mr. Counts' argument on appeal is that BP had made several different statements, and the substituted language created confusion about which statements were being referred to in the letters. The redacted language was needed, Mr. Counts contends, in order to avoid confusing the jury. This argument is unpersuasive because the letter itself did not specify which particular statements were being discussed. It referred only to what BP "has told my lawyer and the D.A.," without indicating any dates, locations, or other details about any particular statements. If the letter was vague, the substituted language preserved that vagueness, but did not cause confusion or mislead the jury.

[¶ 26] The district court decided to insert the substitute language in order to avoid the possibility of calling the District Attorney and Public Defender as witnesses in the trial they were conducting. We tend to agree with Mr. Counts that this was unnecessary. BP was examined and cross-examined about her various statements, and informed the jury that she had at times spoken directly to the District Attorney and the Public Defender. The district court's ruling about the

substitute language was made in advance of BP's testimony, but it was easy to anticipate that she would be thoroughly questioned about her various statements. Because the jury was going to learn that BP had spoken to the District Attorney and Public Defender, it was unnecessary to insert the substitute language in the letters.

[¶ 27] But even if we disagree with the district court's ruling, we reverse only if the error was prejudicial. *Schmid,* ¶ 10, 166 P.3d at 1288. As discussed previously, the substituted language did not confuse the jury any more than the actual language of the letter would have done. The substituted language was not misleading, as the evidence demonstrated that "law enforcement" personnel were present when BP made her statements to the District Attorney, and that an "investigator" was present when BP made her statements to the Public Defender. Mr. Counts has not shown any probability that the verdict might have been different if the language had not been substituted. We therefore conclude that the error, if any, was harmless.

### Issue 2: Cross-examination of victim

[¶ 28] At some point before trial, Mr. Counts learned that the victim, BP, might be working for the Wyoming Division of Criminal Investigation (DCI). During cross-examination of BP, defense counsel informed the district court that she wanted to question BP about this. She asserted that evidence of BP's employment with law enforcement might suggest bias on BP's part, and that it was relevant to the issue of BP's credibility.

[¶ 29] The district court initially ruled that BP's employment with DCI was not, by itself, relevant evidence:

[T]o the extent that she has pending charges ... or has reason to believe that the State has threatened to charge her with something, that would be relevant.... But the focus is, is, does she have a reason to cooperate and testify a certain way. And if there is motive for that or reason for that, then that can be explored.

But to the extent that she has offered to go to work for the DCI, that is not relevant.... Because what I see is probative is, if she believes that the [prosecution] is sitting here with charges in its pocket pending this proceeding ... that her testimony is being compromised for that, that's relevant and that's probative and I'll allow the inquiry there.

To determine whether BP was facing charges that might influence her testimony, the district court allowed BP to be questioned outside the presence of the jury. BP confirmed that she had worked for DCI. However, she testified that she was unaware of any charges pending against her, she had not been threatened with any charges, and to the best of her knowledge, she was not under criminal investigation by any state or federal agency. Based on this testimony, the district court maintained its ruling that questions concerning her employment by DCI would not be allowed.

[¶ 30] Mr. Counts challenges that ruling on appeal. He maintains that the evidence was relevant because, even if there were no charges pending against her, BP's employment with DCI could indicate a general bias in favor of law enforcement. The jury should have been able to consider this potential bias as it analyzed the credibility of BP's testimony against Mr. Counts. Moreover, he claims that the district court's exclusion of this evidence impinged upon his constitutional right to confront witnesses against him. "The primary right secured by the Confrontation Clause of the United States and Wyoming Constitutions is the right of cross-examination." *Miller v. State,* 2006 WY 17, ¶ 8, 127 P.3d 793, 796 (Wyo.2006).

[¶ 31] "A district court's limitation on a defendant's constitutional right to confrontation is a question of law which we review *de novo.* Restrictions on a defendant's right to confront witnesses are subject to harmless error analysis." *Downing v. State,* 2011 WY 113, ¶ 11, 259 P.3d 365, 368 (Wyo.2011) (internal citation omitted), citing *Hannon v. State,* 2004 WY 8, ¶ 11, 84 P.3d 320, 328 (Wyo.2004). "[T]he correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully

realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." *Hannon*, ¶ 25, 84 P.3d at 332, quoting *Olden v. Kentucky*, 488 U.S. 227, 232, 109 S.Ct. 480, 483, 102 L.Ed.2d 513 (1988).

[¶ 32] We have previously noted the importance of a defendant's right to test the credibility of a witness by exploring possible sources of bias.

> The confrontation clause of the sixth amendment guarantees defendants in criminal cases the right "to be confronted with the witnesses against" them. Its main purpose is to provide defendants with the opportunity for effective cross-examination. One of the most important aspects of the right of cross-examination is attacking the witness' credibility and the truth of the testimony. Credibility may be tested by interrogation that attempts to reveal possible biases, prejudices, or ulterior motives.
>
> Defense counsel should ordinarily be given wide latitude when cross-examining a witness about credibility or bias. Counsel should be allowed to "expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." The trial court, however, retains discretion to reasonably limit cross-examination to prevent, among other things, questioning that is repetitive or of marginal relevance.

*Hannon*, ¶ 22, 84 P.3d at 331–32, quoting *United States v. DeSoto*, 950 F.2d 626, 629 (10th Cir.1991).

[¶ 33] Given the wide latitude afforded to defendants when cross-examining a witness about bias, we conclude that evidence about BP's employment by DCI was relevant. "Relevant evidence" is broadly defined to mean "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." W.R.E. 401. If BP worked for a law enforcement agency, that would have at least some tendency to make it more probable that she held a bias in favor of law enforcement. That potential bias, in turn, could cause the jury to question the credibility of her testimony against Mr. Counts. The partiality of a witness is "always relevant as discrediting the witness and affecting the weight of his testimony." 3A Wigmore, *Evidence* § 940, at 775 (Chadbourn rev.1970). Accordingly, we conclude that evidence of BP's employment with DCI was relevant, and that the district court erred in prohibiting cross-examination about that employment.

[¶ 34] We must next consider whether the error was harmful to Mr. Counts' defense.

> An error is harmful if there is a reasonable possibility that the verdict might have been more favorable to the defendant if the error had never occurred. To demonstrate harmful error, the defendant must show prejudice under circumstances which manifest inherent unfairness and injustice or conduct which offends the public sense of fair play.

*Dysthe v. State*, 2003 WY 20, ¶ 10, 63 P.3d 875, 881 (Wyo.2003) (quotation marks omitted). Because Mr. Counts claims error of a constitutional nature, we must reverse unless we conclude that the error was harmless beyond a reasonable doubt. *Hannon*, ¶ 25, 84 P.3d at 332.

> Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Id.*, ¶ 25, 84 P.3d at 332–33, quoting *Olden*, 488 U.S. at 233, 109 S.Ct. at 484.

[¶ 35] Mr. Counts contends that BP was "critically important," as she was the only witness to what occurred between her and Mr. Counts inside the house after Mr. Gilstrap and Mr. Thomas left. That is not entirely accurate, because Mr. Counts testified in his own defense, and related his ver-

sion of what happened inside the house. More significant, key parts of BP's testimony about what happened in her basement bedroom were corroborated by physical evidence and the testimony of other witnesses. For example, her testimony that Mr. Counts hit and choked her was corroborated by physical evidence, including photographs from that night showing fresh bruises on BP's head and neck and long scratches around her throat. Mr. Gilstrap, Mr. Thomas, and several neighbors testified about Mr. Counts chasing BP out the front door, grabbing her by the hair and neck, and dragging her back into the house against her will. The police telephoned and asked Mr. Counts to come out with BP, and Mr. Counts refused. BP was an important witness, but given the other evidence, we do not agree that she was "critically important" to the prosecution's case.

[¶ 36] As noted above, BP's testimony about Mr. Counts breaking in the back door was corroborated by other testimony, and in addition, by physical evidence such as a shoe print on the door that was consistent with the shoes Mr. Counts wore that night. Her testimony about Mr. Counts chasing her out the front door and dragging her back into the house was corroborated by several witnesses. Her testimony about what happened later inside the house was corroborated by physical evidence. Her testimony about Mr. Counts throwing things at her was corroborated by the presence in her room of a broken remote control device and compact disks broken into "little shards" among the other "debris."

[¶ 37] Counsel for Mr. Counts engaged in extensive cross-examination of BP, much of which was aimed directly at the issue of her credibility. BP admitted that she had given inconsistent and changing statements to the police, the public defender's office, and the district attorney's office. She admitted that she might tend to lie if she felt she was in trouble. She was confronted with many inconsistencies between her testimony and that of other witnesses, including, for example, her testimony that she did not see a knife compared to the testimony of Mr. Gilstrap and Mr. Thomas that Mr. Counts was hold-

ing a knife when he broke in the back door. Over the objection of the prosecutor, BP admitted that she had a tendency to "dramatize things," and had made a statement that she might be making "a bigger deal ... than it was" out of the incident. Given defense counsel's thorough cross-examination of BP on questions relating to her credibility, plus other evidence that allowed the jury to evaluate her potential bias, we cannot perceive how evidence concerning her employment with DCI could have had any effect on the jury's verdict. Our conclusion is that the district court's error in excluding evidence about BP's employment by DCI was harmless beyond a reasonable doubt.

### Issue 3: Bill of particulars

[¶ 38] Soon after Mr. Counts was charged and arraigned, he filed a Motion for a Bill of Particulars. The State provided some information in response, but not everything that Mr. Counts sought. At a pretrial hearing, the district court required the State to provide certain additional information, but denied Mr. Counts' motion in other respects. Mr. Counts challenges that ruling on appeal.

[¶ 39] This is an issue we review *de novo*.

> An accused has a constitutional right to notice of the charges against him to allow him a fair opportunity to defend against the charges. United States Constitution, Sixth Amendment; Wyo. Const. art. 1, § 10. *See also*, W.R.Cr.P. 3; *Derksen v. State*, 845 P.2d 1383, 1388–89 (Wyo.1993). Because the right to notice of criminal charges is of constitutional magnitude and the determination on the adequacy of the notice is a question of law, we review the issue *de novo*. *See, e.g., Pena v. State*, 2004 WY 115, ¶ 7, 98 P.3d 857, 862 (Wyo. 2004).

*Heywood v. State*, 2009 WY 70, ¶ 4, 208 P.3d 71, 72 (Wyo.2009), quoting *Barker v. State*, 2006 WY 104, ¶ 14, 141 P.3d 106, 112 (Wyo. 2006).

[¶ 40] In his motion, Mr. Counts sought the following information:

> With respect to Count III, the defendant is charged with kidnapping and alleges both

confinement and removal. Again, the defense respectfully requests that the State be required to inform the Court and defense if it is proceeding on both theories and if so, where was the alleged victim removed from and/or confined. Further, the State should also be required to inform the Court and the Defense of the facts to support the intent to inflict bodily injury and/or what acts constituted the alleged terrorization.

The State responded that it alleged the victim was both removed and confined. The State declined to provide the other information sought by Mr. Counts, contending that it was not required to "disclose factual theories as to what constitutes confinement, removal, terrorizing, or inflicting bodily injury." The district court generally upheld the State's position.

[¶ 41] "The function of a bill of particulars is 'to make more specific the general allegations in the information to enable the defendant to prepare his defense and avoid being surprised at the trial.'" *Heywood*, ¶ 5, 208 P.3d at 72, quoting *Booth v. State*, 517 P.2d 1034, 1036 (Wyo.1974). *See also* Charles A. Wright and Andrew D. Leipold, *Federal Practice and Procedure: Criminal* § 130, at 656 (4th ed.2008). On appeal, Mr. Counts claims that the district court erred in not requiring the State to disclose the location from which the victim was removed or in which she was confined. However, the record demonstrates that the State's failure to specify the location did not cause any confusion or surprise. During the hearing, defense counsel conceded that she already knew this information: "I understand the theory under which they are proceeding, that she's removed from outside by a truck and then taken in this home where I assume the State will allege she's confined." The State's failure to specify the location in a bill of particulars did not hinder Mr. Counts in the preparation of his defense.

[¶ 42] Mr. Counts also argues that the State should have supplied "the facts to support the intent to inflict bodily injury and/or what acts constituted the alleged terrorization." While we have recognized that a bill of particulars is designed to make the general allegations of the charging documents more specific, we have also explained that "a bill of particulars is inappropriate for obtaining evidence, facts, theories, and strategies." *Jansen v. State*, 892 P.2d 1131, 1141 (Wyo.1995). *See also* Wright & Leipold, *supra*, at 668–69 ("Many courts have said that a bill of particulars may not call for evidentiary matter or a detailed preview of the government's trial evidence.").

[¶ 43] In general, the State is not required to provide additional information in a bill of particulars if the charging documents or other disclosures by the State adequately identify "the nature of the offense, the place where it is alleged offenses were committed, the period of time covered thereby, as well as the specific statutes which it was claimed appellant violated." *Vernier v. State*, 909 P.2d 1344, 1352 (Wyo.1996). In Mr. Counts' case, the listed items were fully covered in the Information and its supporting affidavit. The district court did not err in denying Mr. Counts' request for additional factual details.

### Issue 4: Jury instructions

[¶ 44] Mr. Counts asserts that the jury instructions "failed to inform the jury of what was required to constitute kidnapping." Because the instructions were not objected to at trial, we review for plain error.

To demonstrate plain error, an appellant must show: 1) the record clearly reflects the incident urged as error; 2) a violation of a clear and unequivocal rule of law; and 3) that the appellant was materially prejudiced by the denial of a substantial right. *Causey v. State*, 2009 WY 111, ¶ 18, 215 P.3d 287, 293 (Wyo.2009).

*Jones v. State*, 2011 WY 114, ¶ 15, 256 P.3d 527, 533 (Wyo.2011).

[¶ 45] The instruction given to the jury in Mr. Counts' case provided as follows:

The elements of the crime of Kidnapping, as charged in Count III in this case, are:

1. On or about the 15th day of July, 2010;

2. In Natrona County, Wyoming;

3. The Defendant, CHRISTOPHER RAY COUNTS;

4. Unlawfully removed another person from the vicinity where the person was at the time of the removal or unlawfully confined another person;

5. With the intent to inflict bodily injury on that person or to terrorize that person.

If you find from your consideration of all the evidence that each of these elements has been proved beyond a reasonable doubt, then you should find the Defendant guilty.

If, on the other hand, you find from your consideration of all the evidence that any of these elements has not been proved beyond a reasonable doubt, then you should find the Defendant not guilty.

Mr. Counts' argument may be fairly summarized as an objection that this instruction failed to define the terms "removed," "vicinity," "confined," and "terrorize."

[¶ 46] Words in jury instructions "are to be given their plain and ordinary meaning unless otherwise indicated." *Keene v. State*, 812 P.2d 147, 150 (Wyo.1991). When terms in a jury instruction are to be given their plain and ordinary meaning, there is no need to supply a definition. In *Alcalde v. State*, 2003 WY 99, ¶ 15, 74 P.3d 1253, 1260 (Wyo.2003), we considered the same kidnapping statute at issue here, and said that the terms "vicinity" and "confined" should be interpreted in accordance with their ordinary usage:

The ordinary meanings of the words are:

**Vicinity**—1. the quality or state of being near: proximity 2: a surrounding area or district: neighborhood

**Confine**—1. a: to hold within a location b: imprison 2: to keep within limits

Merriam–Webster's Collegiate Dictionary 1316 and 242 (10th ed.1998).

(Emphasis in original.) Given the ordinary meanings of these relatively common words, we rejected Mr. Alcalde's claim that the kidnapping statute was unconstitutionally vague. On the same basis, we reject Mr. Counts' claim that these terms had to be defined for the jury in his case.

[¶ 47] Similarly, we conclude that a definition of the term "remove" was not required. The State's brief quotes this definition from the American Heritage College Dictionary 1177 (4th ed.2002): "1. To move from a place or position occupied: 2. To transfer or convey from one place to another." Given the plain meaning of this ordinary word, the jury did not need a special definition of the term "remove."

[¶ 48] We have some doubt about the term "terrorize." Mr. Counts points out that we have never offered a definition in any of our decisions. He quotes definitions found in cases from other jurisdictions and sources to the effect that to "terrorize" means to frighten in the extreme, and that terror is a high degree of fear or an intense fright or apprehension.

[¶ 49] However, the Legislature provided no indication in the statute that the term "terrorize" is to be given any but its ordinary meaning. The State's brief notes this definition of the term "terrorize," also taken from the American Heritage College Dictionary at 1425: "1. To fill or overpower with terror; terrify: 2. To coerce by intimidation or fear." This common meaning is consistent with the definitions provided by Mr. Counts. Given this common meaning, we also conclude that the district court did not commit plain error when it failed to define the term "terrorize."

## Issue 5: Inconsistent verdict

[¶ 50] Mr. Counts claims that the jury returned an inconsistent verdict because it convicted him on the charge of aggravated burglary, but acquitted him on the charge of aggravated assault and battery. A person is guilty of aggravated burglary in violation of Wyo. Stat. Ann. § 6–3–301(c)(i) if he, "in the course of committing the crime of burglary ... [i]s or becomes armed with or uses a deadly weapon." A person is guilty of aggravated assault and battery in violation of Wyo. Stat. Ann. § 6–2–502(a)(iii) if he "[t]hreatens to use a drawn deadly weapon on another." Mr. Counts claims it was inconsistent for the jury to find that he was, or became, armed with a deadly weapon (thereby finding him guilty of aggravated burglary), but that he did not threaten to use a drawn deadly weap-

on (thereby acquitting him of aggravated assault and battery).

[¶ 51] There is no inconsistency. A person may be armed with a deadly weapon without threatening to use it. In Mr. Counts' case, there was evidence from which the jury could find that he held a knife in his hand when he broke into BP's home (supporting his conviction for aggravated burglary), but the jury could also believe that he did not actually threaten her with it (supporting his acquittal on the charge of aggravated assault and battery). Moreover, the argument lacks legal merit. As Mr. Counts conceded in his brief:

> This Court has repeatedly held that inconsistent verdicts between criminal counts do not justify reversal. *State v. Hickenbottom*, 63 Wyo. 41, 178 P.2d 119, 127 (1947); *Lessard v. State*, 719 P.2d 227, 230–32 (Wyo.1986); *Eatherton v. State*, 810 P.2d 93, 98 (Wyo.1991); *Hankinson v. State*, 2002 WY 86, 47 P.3d 623, 628 (Wyo.2002); *Moore v. State*, 2003 WY 153, [¶ 16,] 80 P.3d 191, 196 (Wyo.2003).... The United States Supreme Court has [also] refused to consider inconsistent verdicts to be grounds for reversal. *Dunn v. United States*, 284 U.S. 390, 52 S.Ct. 189 [76 L.Ed. 356] (1932); *United States v. Powell*, 469 U.S. 57, 105 S.Ct. 471 [83 L.Ed.2d 461] (1984).

Mr. Counts presents no cogent argument for departing from this precedent.

## *Issue 6: Insufficient evidence*

[¶ 52] Finally, Mr. Counts claims that there was insufficient evidence to sustain the jury's verdict that he was guilty of kidnapping, and also insufficient evidence to support the guilty verdict for aggravated burglary. We apply a familiar standard of review:

> [W]e must determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. When considering a claim of the sufficiency of the evidence, we review that evidence with the assumption that the evidence of the prevailing party is true, disregard the evidence favoring the unsuccessful party, and give the prevailing party the

benefit of every favorable inference that we may reasonably draw from the evidence. We will not reweigh the evidence nor will we re-examine the credibility of the witnesses.

*Garner v. State*, 2011 WY 156, ¶ 20, 264 P.3d 811, 820 (Wyo.2011), quoting *Ewing v. State*, 2007 WY 78, ¶ 11, 157 P.3d 943, 946 (Wyo. 2007).

[¶ 53] With respect to the kidnapping charge, Mr. Counts contends that there was insufficient evidence to prove that he intended to terrorize BP. The applicable statute, Wyo. Stat. Ann. § 6–2–201, provides in relevant part:

> (a) A person is guilty of kidnapping if he unlawfully removes another from his place of residence or business or from the vicinity where he was at the time of the removal, or if he unlawfully confines another person, with the intent to:
>
> . . .
>
> (iii) Inflict bodily injury on or to terrorize the victim or another.

In its special verdict, the jury found "beyond a reasonable doubt that the Defendant removed the victim from the vicinity where she was at with the intent to terrorize her," and also found "beyond a reasonable doubt that the Defendant confined the victim with the intent to terrorize her." Mr. Counts claims there was insufficient evidence to support the jury's finding that he "removed" BP, that he "confined" her, or that he did either "with the intent to terrorize."

[¶ 54] Mr. Counts points to evidence showing that he took BP from the outside back into her home. Based on this, he argues that there was no evidence by which the jury could find that he "removed" BP from her home. His argument is, however, based on a faulty portrayal of the charge against him. He was not charged with removing BP from her home, but rather, with removing her from outside where she was hiding near the neighbor's pickup. As previously indicated, defense counsel knew the nature of this charge against Mr. Counts, telling the district court, "I understand the theory under which they are proceeding, that she's removed from outside by a truck and

then taken in this home where I assume the State will allege she's confined." The testimony of BP, Mr. Gilstrap, Mr. Thomas, and several neighbors was sufficient to support the jury's finding that Mr. Counts removed BP from "the vicinity where she was."

[¶ 55] Mr. Counts acknowledges that a victim may be "confined" within her home, but quoting *Darrow v. State*, 824 P.2d 1269, 1270 (Wyo.1992), he asserts that confinement within a home can occur only "if discovery or rescue is made unlikely," and if the victim is "effectively isolated from the usual protections of society." (Quotation marks omitted.) Mr. Counts asserts that his taking BP into her residence "did not make discovery unlikely" because "there was no secrecy to the fact that Mr. Counts and the girlfriend were there. The two men who left knew it, the neighbors knew it and the police knew it." Even if this argument correctly interprets the term "discovery," it ignores evidence demonstrating that Mr. Counts' actions made rescue less likely. The "two men who left" testified that Mr. Counts was holding a knife. After he forced BP back into her home, he sent them outside and locked the door. He then took BP down to her basement bedroom. The police made no move to "rescue" BP, but only surrounded the home and waited. Further, BP testified that Mr. Counts locked the bedroom door and stood in front of it to block her escape. This evidence was sufficient for a jury to find that Mr. Counts had "confined" BP in a place from which rescue was less likely, and where she was isolated from the usual protections of society.

[¶ 56] With regard to the "intent to terrorize," Mr. Counts again contends that to "terrorize" means to frighten in the extreme, and that terror is a high degree of fear or an intense fright or apprehension. "Obviously," Mr. Counts submits in his brief, "the term 'terrorize' is a stronger term than 'frighten,' 'scare,' 'discomfort,' 'alarm' or 'concern.'" According to Mr. Counts, there was no evidence of his intent to inflict such extreme fright on BP. He characterizes BP's testimony as establishing only

> that she was struck [and] yelled at and that music discs in her bedroom were

thrown around and broken. She never testified to any fear beyond the ordinary, indeed, she expressed that she had not thought it was "a big deal." She testified to no verbal threats and specifically testified that she never saw a knife.... There were no threats, deadly or otherwise.

Mr. Counts insists that BP did not experience the extreme fear necessary to be terrorized, but felt only "ordinary" fear.

[¶ 57] This argument seriously understates the evidence. Mr. Thomas and Mr. Gilstrap, testified that BP "freaked out" and became "frantically scared" when Mr. Counts started yelling and knocking on her windows. She ran outside and tried to hide under a parked pickup. Mr. Thomas, Mr. Gilstrap, and the neighbors saw Mr. Counts forcibly grab BP by the hair and neck and drag her back to the house while she was "screaming" and "begging" for help. Mr. Counts confined BP in her basement bedroom, beat and strangled her, called her horrific names, and threw her own possessions at her. When he let BP out of the bedroom, he tied an electric cable around her waist to keep her from running away.

[¶ 58] Given this evidence, it is disturbing that Mr. Counts, in his brief, seeks to characterize this as "a fairly plain vanilla domestic violence case." We reject that characterization. However strong the term "terrorize" might be, the record contains sufficient evidence for a rational jury to find beyond a reasonable doubt that Mr. Counts intended to terrorize his victim.

[¶ 59] Mr. Counts also asserts that there was insufficient evidence to support his conviction on the charge of aggravated burglary. The applicable statute, Wyo. Stat. Ann. § 6–3–301(a), provides that "A person is guilty of burglary if, without authority, he enters or remains in a building, occupied structure or vehicle, or separately secured or occupied portion thereof, with intent to commit larceny or a felony therein." Mr. Counts correctly states that, to convict him under this statute, the jury had to find that he entered BP's house with the intent to commit a felony "therein"—in other words, with the

intent to commit the crime within BP's residence.

[¶ 60] The prosecution charged that Mr. Counts entered BP's residence with the intent to commit two felonies: aggravated assault and kidnapping. The jury found that Mr. Counts did not enter with the intent to commit aggravated assault, but found that he did enter with the intent to commit kidnapping. We therefore consider the evidence only as it relates to kidnapping.

[¶ 61] The kidnapping statute, Wyo. Stat. Ann. § 6–2–201(a), provides that a person is guilty of kidnapping if "he unlawfully removes another from his place of residence or business or from the vicinity where he was at the time of the removal, or if he unlawfully confines another person," with the specified criminal intent. It is Mr. Counts' contention that, under the language of this statute, he could kidnap BP within her residence only by removing her from that residence. *Keene*, 812 P.2d at 150 (Removal "cannot refer to locational changes *within* a victim's residence or a business.") (emphasis in original). He asserts that there was no evidence that he intended to remove BP from her residence. The evidence actually indicates the opposite: he retrieved her from outside and returned her to her residence.

[¶ 62] Mr. Counts further asserts that there was no evidence that he intended to force BP to run outside, or that he anticipated she would do so. After she did, Mr. Counts pursued her and brought her back into the house. Even if this qualifies as removing BP from the vicinity where she was, and therefore constitutes kidnapping, Mr. Counts contends that it was not a kidnapping within her residence, and could not constitute the crime of aggravated burglary "therein." In sum, Mr. Counts argues that there is no evidence that he broke into BP's residence with the intent to kidnap her "therein," and so the evidence was insufficient to support his conviction for aggravated burglary.

[¶ 63] The argument formulated by Mr. Counts ignores a vital portion of the kidnapping statute. Again, Wyo. Stat. Ann. § 6–2–201(a) provides that a person is guilty of kidnapping if "he unlawfully removes another from his place of residence or business or from the vicinity where he was at the time of the removal, *or* if he unlawfully confines another person." (Emphasis added.) As we did in *Keene*, 812 P.2d at 150, we interpret the emphasized *or* as making the statutory alternatives "separate and distinct" and mutually exclusive. Thus, to support the jury's finding that Mr. Counts broke into the house with the intent to commit kidnapping, it was not also necessary for the jury to find an intent to remove her from the house. It was sufficient for a conviction if the jury found that he intended to confine and terrorize her "therein."

[¶ 64] The evidence, considered in the light most favorable to the State, is sufficient to support a finding that Mr. Counts entered the house with the intent of confining and terrorizing BP. Before Mr. Counts entered the house, he sounded "Angry. Very angry." BP "freaked out" and became "frantically scared." She explained that Mr. Counts was "jealous," and if he got into the house, "he was going to be very upset with me," and "it wasn't going to be pretty." Mr. Counts violently broke in through the back door, smashing glass, and breaking parts of the door jamb. He carried a knife. He pursued BP when she escaped. He forcibly returned her to the house and held her in her basement bedroom. This evidence is adequate for a rational jury to find, beyond a reasonable doubt, that when Mr. Counts broke in through the back door of the house, he did so with the intent to confine and terrorize BP "therein." There is sufficient evidence to support his conviction on the charge of aggravated burglary.

[¶ 65] Affirmed.